In re NICOLE GAS PRODUCTION, LTD., Debtor.

No. 09–52887.

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Signed Sept. 26, 2014.

Clifford O. Arnebeck, Jr., Columbus, OH, Anne Owings Ford, McDonald Hopkins LLC, James Allison Lowe, Cleveland, OH, for Interested Party.

Rick L. Ashton, J. Matthew Fisher, Allen Kuehnle Stovall & Neuman LLP, Christy Prince, Kegler, Brown, Hill & Ritter, LPA, Timothy S. Rankin, Onda, LaBuhn, Rankin & Boggs Co., LPA, Derek L. Graham, Larry J. McClatchey, Arnold S White, Columbus, OH, Lee M. Brewer,

Alber Crafton, PSC, Westerville, OH, Sara J. Daneman, Blacklick, OH, for Creditor.

Brenda K. Bowers, Frederick L. Ransier, Columbus, OH, for Trustee.

*MEMORANDUM OPINION AND OR-*
*DER (A) HOLDING FREDDIE L.*
*FULSON, JAMES A. LOWE AND*
*ROBERT C. SANDERS IN CON-*
*TEMPT OF COURT FOR VIOLAT-*
*ING THE AUTOMATIC STAY AND*
*(B) ESTABLISHING PROCE-*
*DURES FOR DETERMINING*
*DAMAGES*

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

## I. Introduction

About a year before his death, Freddie Fulson sued Columbia Gas Transmission, LLC and three of its affiliates in state court for alleged violations of the Ohio Corrupt Practices Act. His attorneys, Robert Sanders and James Lowe, filed the complaint commencing the lawsuit, seeking damages based on injuries the purportedly corrupt activities allegedly caused two companies Fulson had founded, including Nicole Gas Production, Ltd., or NGP, which is the debtor in this Chapter 7 case. Sanders and Lowe filed the lawsuit even though Frederick Ransier, the trustee of NGP's bankruptcy estate, was seeking authority from this Court to settle all of NGP's claims against the Columbia Gas entities.

Ransier contends that the lawsuit asserts claims that are property of NGP's bankruptcy estate and that, by commencing and pursuing the suit, Fulson, Sanders and Lowe violated the automatic stay. In their defense, Sanders and Lowe argue—as did Fulson before his death—that the claims belonged to Fulson personally, not to NGP's bankruptcy estate.

For the reasons explained below, the Court concludes that the claims belong to NGP's estate and that Fulson, Sanders and Lowe violated the automatic stay and were in contempt of Court when they commenced and continued the state court action. Having determined that Fulson, Sanders and Lowe engaged in contemptuous conduct, the Court also establishes procedures for determining the amount of damages Ransier may recover on behalf of NGP's estate.

## II. Jurisdiction and Constitutional Authority

The Court has jurisdiction to hear and determine this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O).

The Court also must evaluate whether it has the constitutional authority to enter a final order in this contested matter after *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). By this opinion and order, the Court finds that Fulson, Sanders and Lowe ("Fulson Parties") violated the automatic stay. "There is no question that bankruptcy court[s] continue[ ] to have the authority to enter judgment on [trustees'] claims for violation of the automatic stay[,]" post-*Stern,* because "the automatic stay is fundamental to the bankruptcy system enacted by Congress." *Loveridge v. Hall (In re Renewable Energy Dev. Corp.),* 500 B.R. 77, 93 (D.Utah 2013); *see also Tow v. Henley (In re Henley),* 480 B.R. 708, 765 (Bankr. S.D.Tex.2012) ("[T]he requested relief—that the ... Carooms be found in violation of the automatic stay—is unique to the Code. Such relief is not possible to obtain under state law. As a result, this Court concludes that *Stern* is inapposite, and this Court is constitutionally authorized to enter a final judgment regarding the dis-

putes at bar."). In order to determine whether the Fulson Parties violated the automatic stay, the Court must determine whether the claims Fulson asserted in the state court case are property of NGP's bankruptcy estate. The Court has the authority to determine whether the claims are property of the estate even if, as here, "making that determination require[s] the bankruptcy court to apply state law" because "[t]his is an essential part of administration of the bankruptcy estate and stems from the bankruptcy itself." *Velo Holdings Inc. v. Paymentech, LLC* (*In re Velo Holdings Inc.*), 475 B.R. 367, 387 (Bankr.S.D.N.Y.2012).

The Court also has the constitutional authority to enter a final order holding the Fulson Parties in contempt and awarding sanctions to Ransier to compensate NGP's estate for damages caused by that contempt.[1] *See In re Brown,* 511 B.R. 843, 848 (Bankr.S.D.Tex.2014) (holding that bankruptcy courts have the constitutional authority to impose sanctions for contempt after *Stern* ); *In re Green,* No. 12–13410, 2014 WL 1089843, at *1 (Bankr.N.D.Ohio Mar. 19, 2014) (same); *Schermerhorn v. CenturyTel, Inc.* (*In re Skyport Global Commc'ns* ), No. 08–36737–H4–11, 2013 WL 4046397, at *41 (Bankr.S.D.Tex. Aug. 7, 2013) (same).

### III. Procedural Background

In January 2013, Fulson commenced a lawsuit ("2013 State Court Case") against Columbia Gas Transmission, LLC ("TCO"); Columbia Gas of Ohio, Inc.; Columbia Gas of Pennsylvania, Inc. and Columbia Gas of Kentucky, Inc. (collectively,

"Columbia Gas Entities"). The complaint commencing the lawsuit ("Complaint") was filed in the Court of Common Pleas of Franklin County, Ohio ("State Court") and identified Sanders and Lowe as Fulson's counsel.

This matter is before the Court on Ransier's motion ("Motion") (Doc. 119) requesting that the Court enter an order directing the Fulson Parties to "appear and show cause as to why each should not be held in civil contempt and sanctioned for violating the automatic stay" by filing the Complaint and an amended complaint ("Amended Complaint"). Mot. at 10.[2] The Fulson Parties filed a response to the Motion ("Fulson Parties Response") (Doc. 122, with Exhibit 1 filed as Doc. 124). The Fulson Parties Response acknowledged that "Mr. Lowe, with Mr. Sanders of counsel, filed" the Complaint on behalf of Fulson. Fulson Parties Resp. at 1. They also stated that they had "carefully considered whether the filing of the [Complaint] would violate the automatic stay in this case and concluded, in good faith, that it would not[,]" *id.,* but did not cite any statutory or case law authority supporting this conclusion.

Ransier filed a reply ("Ransier Reply") (Doc. 125) and, in accordance with an order the Court entered granting their motion to file a further reply, the Fulson Parties filed a surreply in which they continued to assert that filing the Complaint did not violate the automatic stay ("Surreply") (Doc. 132). The only authority they cited was portions of sections 2923.31–

---

1. By this opinion and order the Court holds the Fulson Parties in contempt but, rather than awarding sanctions, establishes procedures for determining the amount of sanctions. Thus, this order is not yet a final order. *See Wicheff v. Baumgart* (*In re Wicheff* ), 215 B.R. 839, 843 (6th Cir. BAP 1998)

("A civil contempt order is not final unless: (1) a finding of contempt is issued, *and* (2) a sanction is imposed.").

2. A copy of the Complaint is attached as Exhibit 1 to the Motion. A copy of the Amended Complaint is located at Doc. 124.

2923.36 of the Ohio Revised Code, the Ohio Corrupt Practices Act ("OCPA").

After those documents were filed, the Court entered an order directing the Fulson Parties to appear and show cause why they should not be held in civil contempt and sanctioned for violating the automatic stay ("Show Cause Order") (Doc. 137).[3] The Fulson Parties then filed a document containing a single case as supplemental authority (Doc. 146), *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 23 F.Supp.2d 771 (N.D.Ohio 1998), which is discussed below. The only authority *Iron Workers* was supplemental to was the OCPA, as *Iron Workers* was the sole case the Fulson Parties had cited at that point.

Sanders filed a motion for reconsideration of the Show Cause Order ("Sanders Motion") (Doc. 161). Lowe also filed a motion for reconsideration or, alternatively, certification of an issue to the Supreme Court of Ohio ("Lowe Motion") (Doc. 164). The Court entered an order (Doc. 166) denying the Sanders Motion and the Lowe Motion.

During the hearing on the Motion and the Show Cause Order, the Court, without objection by any party, admitted into evidence the Complaint and the Amended Complaint, a suggestion of stay filed by Ransier in the State Court, the response to the suggestion of stay filed by Fulson and the State Court's order designating the 2013 State Court Case as inactive. The Court also heard the testimony of Ransier, Sanders and Lowe. Fulson attended the hearing but did not testify.

At the conclusion of the hearing, the Court requested post-hearing briefs. In accordance with an order establishing a post-hearing briefing schedule, Ransier filed a brief in support of the Motion (Doc. 178), and Sanders filed a brief in opposition ("Sanders Brief") (Doc. 182), as did Lowe ("Lowe Brief") (Doc. 183) and Fulson ("Fulson Brief") (Doc. 185). Ransier filed a reply brief (Doc. 187). A document was later filed advising the Court and parties in interest that Fulson had died (Doc. 188). On August 6, 2014, Lowe filed a notice (Doc. 190) stating that Fulson's estate had been substituted as the plaintiff in the 2013 State Court Case, effectively substituting it as the party in interest in this contested matter.

## IV. Findings of Fact

Based on the evidence adduced at the hearing, including the documentary evidence and the testimony presented, and having considered the demeanor and credibility of the witnesses, the Court makes the findings of fact set forth below.

### A. Events Leading to the Filing of the Complaint

The Complaint provides much of the factual background necessary to understand the disputes that led to its filing. TCO owns and operates an interstate natural gas pipeline system in multiple states, and the other Columbia Gas Entities own and operate local distribution systems in certain of those states. Compl. ¶¶ 2–5. In the mid–1990s, the federal government and various states took steps that provided independent gas companies access to the interstate gas pipeline system and local

---

**3.** The issuance of a show cause order does not shift the burden of proof from the movant, but instead "acts as notice to the relevant party by informing the party what conduct is alleged to be sanctionable, and allows the party an opportunity to respond[.]" *Cook v. Am.*

*S.S. Co.*, 134 F.3d 771, 776 (6th Cir.1998). "[B]y presenting evidence and arguments why sanctions should not be imposed, the party has the opportunity to 'persuade' the court that sanctions are not warranted." *Id.*

gas distribution systems of companies such as the Columbia Gas Entities. Compl. ¶¶ 12–22. In order to take advantage of the opportunities afforded by this access, Fulson formed NGP and Nicole Energy Services, Inc. ("NES"). Compl. ¶¶ 23–24. Fulson was the president and sole owner of another company he formed, Nicole Gas Marketing, Inc. ("NGM"), which according to the Complaint was the sole owner of both NGP and NES. Compl. ¶ 1.[4] In 1999, NGP purchased 138 gas-producing wells in Pennsylvania and West Virginia and began selling the gas produced from those wells to NES. Compl. ¶¶ 26–28. Unable to transport and distribute the gas itself, NES entered into agreements with the Columbia Gas Entities to transport NES's natural gas over the Columbia Gas system and to distribute the gas to NES's customers. Compl. ¶¶ 29–30.

In mid–2001, the Columbia Gas Entities commenced a lawsuit in the State Court alleging that they had delivered more gas to NES's customers than NES had placed into the system ("2001 State Court Case"). Compl. ¶¶ 51–52. In response, NES filed a third-party complaint alleging that the Columbia Gas Entities had failed to credit NES with the amount of gas it had injected into the system. Compl. ¶ 53. NES lost most of its wells after it was unable to service the debt it incurred to purchase them, Compl. ¶ 95, and ceased operations in 2002. Compl. ¶ 50. Fulson contended that it was "TCO's mis-measurement and under-crediting of the gas produced by the NGP wells [that] had caused NGP to lose most of its 138 wells...." Compl. ¶ 95. Afterward, NGP continued to sell natural gas to its customers from its remaining wells pursuant to a contract with TCO that permitted NGP to use the transportation

capabilities of TCO ("NGP Agreement"). Compl. ¶¶ 93–95. As went NES, so went NGP, which sold the remaining wells and went out of business in 2004. Compl. ¶¶ 96–101.

In time, both NES and NGP entered bankruptcy. NES was first. Following the Columbia Gas Entities' filing of an involuntary Chapter 7 petition against NES one business day before the trial of the 2001 State Court Case was to begin, Compl. ¶ 57, and after several months of legal wrangling (including a dispute over the removal of the 2001 State Court Case to this Court), NES filed a voluntary Chapter 11 petition and became a voluntary Chapter 11 debtor in 2004. Compl. ¶¶ 61, 69, 74–76. The Columbia Gas Entities then filed a motion for the appointment of a Chapter 11 trustee, and the Court ultimately ordered the appointment of a trustee. Compl. ¶¶ 78–79. The Complaint attempts to paint the appointment of a Chapter 11 trustee as part of a scheme on the part of the Columbia Gas Entities, but fails to point out that NES agreed to the appointment of a Chapter 11 trustee. See Agreed Order to Appoint Chapter 11 Trustee, Doc. 155 in Case No. 03–67484.

The United States Trustee appointed Larry J. McClatchey as the Chapter 11 trustee of NES's estate, and the Court approved McClatchey's appointment. See Order Approving Appointment of Chapter 11 Trustee, Doc. 162 in Case No. 03–67484. McClatchey filed an application to employ Sanders as special counsel to prosecute NES's third-party complaint for breach of contract in the 2001 State Court Case, which was granted by the Court. Thus, as he had done before NES's bankruptcy, Sanders continued to represent the compa-

4. While the Complaint identified NGM as the sole owner of NGP, the schedules that Fulson prepared for filing in NGP's case (Doc. 28) identified a different entity, Nicole Energy Marketing, Inc. ("NEM"), as the sole owner of NGP.

ny in the 2001 State Court Case. Compl. ¶ 80.

In 2005, McClatchey filed a motion to remand NES's third-party complaint back to the State Court, a motion the Court granted. Compl. ¶¶ 81–82. In the 2001 State Court Case, NES asserted that "TCO's mis-measurement and under-crediting of the gas from the NGP wells caused NES net damages" in excess of $36 million. Compl. ¶ 85. McClatchey and TCO eventually entered into a multimillion dollar settlement of any claims NES had against the Columbia Gas Entities. In particular, McClatchey and TCO "entered into a settlement of NES's third-party claim against TCO in the form of an Asset Purchase Agreement ('APA') [under which] TCO agreed to purchase NES's $36.6 million breach of contract claim against TCO, and all other claims that NES had asserted or could assert against TCO [and its affiliates], for $2.7 million, plus the payment of ... certain administrative expenses."[5] Compl. ¶¶ 87–88. McClatchey filed a motion for approval of the APA, which the Court granted in 2008 over Fulson's objection following a multiday hearing. Compl. ¶¶ 89–90. In 2012, the Court granted McClatchey's motion for a final decree closing the NES Chapter 11 case. Compl. ¶¶ 91–92.

NGP's bankruptcy case was initiated by the filing of an involuntary Chapter 7 petition on March 23, 2009 ("Petition Date"). Compl. ¶ 105. In May 2009, the Court entered an order for relief, making NGP a Chapter 7 debtor, and Ransier was appointed the Chapter 7 trustee of NGP's estate that same month. Compl. ¶ 106.

Ransier eventually filed a motion under Rule 9019(a) of the Federal Rules of Bankruptcy Procedure ("Settlement Motion") (Doc. 104) requesting that the Court authorize him to accept a cash payment of $250,000 in exchange for complete releases of any and all claims of NGP against the Columbia Gas Entities. Compl. ¶ 107; Settlement Mot. ¶ 34. The Settlement Motion actually was the second motion Ransier filed for approval of a compromise of claims between NGP and the Columbia Gas Entities. The first motion was denied by the Court, in part because it did not "identify or describe the claims to be released, nor ... explain why the amounts to be paid to the estate[ ] of [NGP] are substantially less than the amount TCO paid to the estate of NES." Order, Doc. 87 at 13. Ransier then filed the Settlement Motion and, to support his assertion that the $250,000 sum offered by TCO constituted a fair settlement cited, among other things, the fewer number of wells at issue in the NGP case than were involved in the NES case. Settlement Mot. at 19. The $250,000 amount would fund a distribution to NGP's creditors (including McClatchey on behalf of the creditors of NES) of far less than 100% of their claims, meaning that no funds would be available to pay Fulson anything on account of any indirect ownership interest he asserted in NGP. Settlement Mot. at 15–20. Fulson filed an objection to the Settlement Motion (Doc. 111), as did Sanders (Doc. 112).[6] Tr. at 47.

At some point, Fulson and Sanders decided to commence the 2013 State Court Case. The Complaint was prepared in which Fulson asserts claims under the

---

**5.** As discussed in the opinion that the Court is contemporaneously issuing on Ransier's motion for approval of a settlement of NGP's claims against the Columbia Gas Entities, the estimated value of the NES settlement was $4.33 million.

**6.** A hearing on the approval of the Settlement Motion was held the day following the hearing on the Motion; an opinion and order granting the Settlement Motion is being entered contemporaneously with this opinion and order.

OCPA, a statute Sanders has referred to as "the Ohio version of the federal RICO statute." Hearing Transcript ("Tr."), at 72. Sanders was the sole drafter of the Complaint. Tr. at 77. After drafting it, he contacted Lowe to ask whether he would be willing to serve as local counsel. Tr. at 97. Lowe reviewed the Complaint and agreed to serve as local counsel, signing the Complaint on behalf of Fulson. Tr. at 98–99; Compl. at 1, 28–29. The Complaint, which identified Sanders as of counsel, was filed on January 24, 2013.

## B. The Fulson Parties' Awareness of the Automatic Stay

The Fulson Parties were aware of the pendency of NGP's bankruptcy case and the automatic stay when they filed the Complaint. Tr. at 34, 86–89, 100, 105. Sanders conceded that he knew the automatic stay was in place at that time and that the stay "d[id] not permit any actions to seek property of the estate." Tr. at 90; see also Tr. at 105. Sanders made Lowe aware of the automatic stay, Tr. at 86, and Lowe acknowledged that he had knowledge of the NGP bankruptcy and the automatic stay at the time he reviewed the Complaint. Tr. at 98, 100. Fulson relied on Sanders's representation that filing the Complaint would not violate the automatic stay, Tr. at 87, which means that Fulson also was aware that the automatic stay was in effect in NGP's case.

Despite their knowledge of the automatic stay, the Fulson Parties did not provide Ransier with notice of the filing of the Complaint. Tr. at 32–33. Nor did they seek relief from the automatic stay before filing it. Tr. at 89. Sanders testified that this was because he believed that the 2013 State Court Case "in no way did or even could be an effort to get property of the estate." Tr. at 90:7–10. Likewise, Lowe testified that he believed that this was "not

a case in which Mr. Fulson is seeking anything from [NGP] or for [NGP];" that "since it seeks nothing from the estate or for the estate of the bankrupt, that it's permissible, and it is not a violation of the stay," Tr. at 98; and that "under Ohio law Mr. Fulson has an independent claim that has nothing to do with NGP." Tr. at 102. Because the Fulson Parties failed to notify him that the Complaint had been filed, Ransier learned of the 2013 State Court Case only after a member of his office staff who regularly reviews state court dockets brought it to his attention. Tr. at 51.

## C. The Complaint

Upon reading the Complaint, Ransier saw that, in addition to recounting the background facts summarized above, it alleged that those facts evidenced an "illegal scheme to eliminate the Nicole companies [NGP and NES] as competitors and unlawfully block them from redress in court." Compl. ¶ 34. According to the Complaint, the purported scheme was unlawful because the Columbia Gas Entities allegedly had violated the OCPA, Compl. ¶ 6, and Fulson was entitled to damages because the OCPA provides that "'any person directly or indirectly injured'" by certain conduct shall have "'a cause of action for triple the actual damages the person sustained.'" Compl. ¶ 110 (quoting section 2923.34(E) of the Ohio Revised Code).

Fulson asserted claims under the OCPA ("Ohio RICO Claims") for damages "in his capacity as the 100% owner of NES and NGP." Compl. ¶ 125. According to the Complaint, the Ohio RICO Claims were based on 13 predicate acts. Given that NGP ceased operating five years before it entered bankruptcy, it is unsurprising that those predicate acts all occurred before the Petition Date of March 23, 2009. The acts alleged to have occurred included using interstate mail and wire communications

for fraudulent purposes from December 1, 1999 to September 2002, Compl. ¶ 124(1)–(4), dates that preceded the Petition Date.

The Complaint also alleges other acts that occurred before the Petition Date— "fraudulently forc[ing] NES into involuntary bankruptcy on November 14, 2003[,]" Compl. ¶ 124(5); "unlawfully solicit[ing] third-parties to join as bankruptcy petitioners from November 2003 through January 2004[,]" Compl. ¶ 124(6); "fraudulently maintain[ing] the NES involuntary bankruptcy from November 14, 2003 to November 5, 2012[,]" Compl. ¶ 124(7); "seek[ing] the appointment of a Chapter 11 Trustee in the NES bankruptcy[,]" Compl. ¶ 124(8); "from October 2006 through April 2008 ... unlawfully block[ing] NES from redress for [other] predicate acts ... by purchasing NES's damage claims against TCO," Compl. ¶ 124(9); "from September 1, 2002 through April 7, 2004 ... fraudulently credit[ing] NGP with only one-third of the gas delivered by NGP into the TCO system," Compl. ¶ 124(10); "using interstate mail and wire communications from September 1, 2002 through April 7, 2004 to fraudulently misappropriate two-thirds of the gas delivered by NGP into the TCO system," Compl. ¶ 124(11); "using interstate mail and wire communications from September 1, 2002 to the present to fraudulently seize and 'escrow' gas delivered by NES into the TCO system[,]" Compl. ¶ 124(12); and "using interstate and mail and wire communications in February and March of 2009 to unlawfully solicit third-parties to file a Chapter 7 involuntary bankruptcy petition against NGP...." Compl. ¶ 124(13).

Two of these alleged predicate acts warrant further discussion because they are framed in such a way to suggest that they occurred after the Petition Date even though they did not. The predicate act of

allegedly "fraudulently maintaining" the NES involuntary bankruptcy case through November 5, 2012 occurred before the Petition Date in the NGP case (even though the Petition Date was March 23, 2009). The Columbia Gas Entities were petitioning creditors in the NES involuntary bankruptcy, but the case became a voluntary Chapter 11 case, and an agreed order with NES regarding the appointment of a trustee was entered, in 2004. *See* Case No. 03–67484, Doc. 155. The appointment of McClatchey also was approved by an order entered in 2004. *See* Case No. 03–67484, Doc. 162. Even if it could be argued that the Columbia Gas Entities were "maintaining" the NES bankruptcy before the appointment of a trustee, no basis exists for alleging that the Columbia Gas Entities were doing so after the appointment of McClatchey as the trustee of NES's estate, which occurred several years before the Petition Date in the NGP case.

Similarly, the predicate act of "using interstate mail and wire communications from September 1, 2002 *to the present* to fraudulently seize and 'escrow' gas delivered by NES into the TCO system[,]" Compl. ¶ 124(12) (emphasis added), did not truly relate to events occurring after the Petition Date, because the Complaint itself states that NES "ceased operations in September of 2002[,]" Compl. ¶ 50, and that NGP "went out of business" in April 2004. Compl. ¶ 101. Accordingly, no gas was or could have been seized from NES or NGP after April 2004.

In response to the Show Cause Order— in which the Court laid out the reasons why the predicate acts all occurred prior to the Petition Date—Sanders responded that the Court's conclusion that the fraudulent escrowing of gas occurred before the Petition Date "ignores that the escrowing of the gas has not ceased and continues to inflict harm on both NES and NGP, not-

withstanding that neither is presently operating." Sanders Mot. at 11 n. 3. If the Columbia Gas Entities fraudulently seized and escrowed gas prior to April 2004, then perhaps it owed NES or NGP compensation. But to the extent the Columbia Gas Entities owed NES or NGP compensation for any seizure and escrowing of gas, McClatchey settled any such claim for compensation on behalf of NES by way of the APA, and Ransier is in the process of doing so on NGP's behalf.

Further, the argument that the claim did not arise *before* the Petition Date because the allegedly fraudulent escrowing continued *after* the Petition Date defies logic. Under Sanders's reasoning, NGP would have a claim based on the allegedly fraudulent escrowing only after it stopped. But that makes no sense. As explained in more detail below, § 541(a)(1) of the Bankruptcy Code provides that interests of the debtor in property existing as of the commencement of the bankruptcy case, including causes of action, are property of the estate. As of the Petition Date, NGP could have brought the claim for any fraudulent escrowing that began before the Petition Date even if it continued after the Petition Date. In sum, the Ohio RICO Claims arose entirely prior to the Petition Date. To the extent the Ohio RICO Claims are based on damages sustained by NGP ("NGP Ohio RICO Claims"), and to the extent they had any validity, NGP would

have had the right to assert them as of the Petition Date.[7]

Fulson alleged that the purported violations of the OCPA caused him damages in his capacity as the sole owner of NES and NGP. Compl. ¶ 126. According to the Complaint, there were two components to the damages: (1) "the net damages of $36,654,305.94 sustained by NES as of March 31, 2006" minus "the $2,700,000 paid by TCO to the NES Chapter 11 estate;" and (2) "the damages sustained by NGP from December 1, 1999 to the present in the form of lost profits and the loss of oil and gas rights to 20,000 acres in the Appalachian Marcellus Shale Gas play[.]" Compl. ¶ 126. Unlike the damages sought by Fulson for harm allegedly sustained by NES—which he netted against the NES settlement—the Complaint referenced no netting on account of the proposed settlement between Ransier and TCO. Importantly, Fulson did not allege that he was damaged in any way other than "in his capacity as the 100% owner of NES and NGP." Compl. ¶ 125.

Ransier noted the "similarities [between] the allegations in th[e] [C]omplaint [and] the matters that were pending in our compromise motion" and also noted that the "allegations in [the] third-party complaint[ ] [filed in the 2001 State Court Case] are "fairly similar, and in some cases identical" to the matters that are the subject of the proposed compromise. Tr. at 35.[8] His intent in settling with TCO and

---

7. NGP was an Ohio domestic limited liability company. *See* Ohio Secretary of State, http://www.sos.state.oh.us (last visited Sept. 26, 2014). As such, NGP is a person with the capacity to have a cause of action under the OCPA. *See* Ohio Rev.Code Ann. § 2923.31(G) (West 2014) (defining person for purposes of the OCPA to include "any person, as defined in section 1.59 of the Revised Code"); Ohio Rev.Code Ann. § 1.59 (" 'Person' includes an individual, corporation, business trust, estate, trust, partnership, and association."); *Dexxon*

*Digital Storage, Inc. v. Haenszel,* 161 Ohio App.3d 747, 832 N.E.2d 62, 69 (2005) (holding that a limited liability company is a person within the meaning of Ohio Rev.Code § 1.59).

8. Exhibit 5 to the Motion "highlights all of the portions of the Fulson Complaint which have been copied word-for-word from Sanders' Objection to the Settlement Motion." Mot. at 7.

filing the Settlement Motion was to settle "all claims [of NGP's estate] that existed against Columbia Gas[,]" Tr. at 36, and yet the Complaint asserted claims against the Columbia Gas Entities, claims that Ransier believes are property of NGP's estate. Tr. at 38, 42, 48.

### D. The Motion and the Amended Complaint

Based on his review and analysis, Ransier concluded that the filing of the Complaint violated the automatic stay. Tr. at 35. He thus filed the Motion on February 13, 2013, requesting that the Court enter an order directing the Fulson Parties to appear and show cause why they should not be held in civil contempt and sanctioned for seeking to exercise control over property of the estate in violation of the automatic stay.

On February 13, 2013, Ransier also filed a Notice of Bankruptcy and Suggestion of Stay with the State Court ("Stay Notice").[9] In response, the State Court entered an order ("Stay Order")[10] providing that "[i]t appearing that this case has been stayed by the U.S. Bankruptcy Court ... this case is designated inactive pending further order of the Bankruptcy Court, or by motion of a party herein to proceed in a manner not stayed by that Court." Stay Order at 1. This Court has not issued any order lifting the stay, and Fulson never filed a motion "to proceed in a manner that is not stayed...." Instead, despite the Stay Order, Fulson filed the Amended Complaint. Tr. at 36–37, 53.[11]

Because the Amended Complaint was filed in violation of the State Court's own Stay Order, it is not clear that the Amended Complaint operated as an effective amendment of the Complaint. Furthermore, the Amended Complaint alleged that the Columbia Gas Entities engaged in an "illegal scheme to eliminate the Nicole companies as competitors and unlawfully block them from redress in court[,]" Am. Compl. ¶ 34, and by "Nicole companies," the Amended Complaint meant both NGP and NES. Am. Compl. ¶ 24 (defining "Nicole companies" to mean both NGP and NES). Once again, the Amended Complaint alleged that the purported scheme was unlawful because the Columbia Gas Entities had violated the OCPA. Am. Compl. ¶ 6. In the Amended Complaint, Fulson asserted claims for damages "in his capacity as the 100% owner of NES." Am. Compl. ¶ 108. Lowe signed the Amended Complaint as counsel to Fulson and Sanders was identified as of counsel. Am. Compl. at 22–23.

According to the Amended Complaint, the Ohio RICO Claims were based on nine of the predicate acts already discussed above, including "using interstate mail and wire communications to fraudulently force NES into involuntary bankruptcy on November 14, 2003 based on fraudulent creditor claims and for the purpose of fraudulently blocking ... NGP from legal redress for predicate acts (1)-(4), in violation of 18 U.S.C. 1341 (mail fraud), 18 U.S.C. 1343 (wire fraud) and Ohio Rev.Code 2913.05 (telecommunications fraud)...." Am. Compl. ¶ 107(5). Those predicate acts all occurred before the Petition Date. Fulson alleged that the purported violations of the OCPA caused him "net damages of $36,654,305.94 sustained by NES as of March 31, 2006"

---

9. A copy of the Stay Notice is attached as Exhibit 6 to the Motion.

10. A copy of the Stay Order is attached as Exhibit 1 to the Ransier Reply.

11. Fulson also filed a response to the Stay Notice, a copy of which is attached as Exhibit 2 to the Ransier Reply.

minus "the $2,700,000 paid by TCO to the NES Chapter 11 estate." Am. Compl. ¶ 109.

Sanders and Lowe contend that, by seeking damages only for the alleged harm to NES, the Amended Complaint cured any violation of the automatic stay as to NGP. Ransier, though, did not see it that way. Tr. at 37. According to Ransier, "it seemed pretty clear within the [Amended Complaint] the belief that there was a claim to be made at some point in the future by Mr. Fulson [on account of damages allegedly sustained by NGP], essentially under the same facts and issues that we were trying to resolve in our compromise." Tr. at 37. As already noted, the Amended Complaint alleges an illegal scheme as to both NGP and NES and includes a reference to NGP in one of its predicate acts. Thus, the Court's review of the Amended Complaint validates Ransier's view that it appears deliberately designed to say enough to permit (once the NGP case is closed) a further amendment that seeks damages based on harm allegedly suffered by NGP. And it appears that this was the Fulson Parties' intent.

After the hearings on the Motion and the Settlement Motion, the Court entered an Order (A) Providing Notice of Proposed Injunction and (B) Establishing Briefing Schedule on the Issue of the Appropriateness of the Injunction ("Injunction Notice") (Doc. 169). The Injunction Notice stated that during the hearing on the Settlement Motion "counsel for TCO stated that TCO would pay the settlement amount only upon the satisfaction of two conditions: (1) the Court's approval of the compromise; and (2) the Court's issuance of an injunction enjoining any entity from pursuing derivative claims and/or other claims that are property of NGP's bankruptcy estate." Injunction Notice at 1. The Injunction Notice provided notice of

the Court's intent to issue such an injunction if it approved the Settlement Motion:

[T]he Court intends—if it approves the Motion—to permanently enjoin all entities from pursuing claims that are property of NGP's estate, including, without limitation, claims that are derivative of those belonging to NGP's estate. The claims enjoined would include the claims asserted in the pending lawsuit against TCO and affiliated entities filed by Freddie Fulson (through his attorneys Robert Sanders and James Lowe) in the Court of Common Pleas of Franklin County, Ohio, Case No. 13CVH–972, to the extent that the claims asserted in that lawsuit are determined to be derivative of claims of NGP or are otherwise determined to be property of NGP's bankruptcy estate, as well as any such claims that might be asserted in the future.

Injunction Notice at 2.

Ransier filed a brief in support of the injunction (Doc. 177), but Sanders and Lowe opposed it. See Response of James A. Lowe and Robert C. Sanders to Chapter 7 Trustee's Brief in Support of the Issuance of an Injunction Upon Approval of the Compromise Motion ("Injunction Response") (Doc. 184). In the Injunction Response, Lowe and Sanders contend that the Amended Complaint "seeks no *damages* from harm on [sic] NGP" and that "[s]ince the operative complaint clearly does not assert a claim of the Estate, there is no need for an injunction." Injunction Resp. at 16. To the contrary, the Injunction Response demonstrates the need for the proposed injunction. There would have been no point in Lowe's and Sanders's opposing the proposed injunction if they had not intended to amend the Amended Complaint to reassert damages on account of injury to NGP. Further, given that the Amended Complaint was

filed in violation of the State Court's own Stay Order, the filing of the Amended Complaint arguably was ineffective, leaving the Complaint as the operative pleading.

Because the NGP Ohio RICO Claims were property of NGP's estate and Ransier was settling them, he could not stand idly by once the Fulson Parties filed the 2013 State Court Case. Ransier requested additional sums from TCO to cover the costs that NGP's estate would incur as a result of actions he needed to take in order to address the 2013 State Court Case in the State Court and here. Tr. at 61. This request did not lead to any additional consideration from TCO, but Ransier's conversations with a representative of TCO confirmed that the settlement covered—just as the Settlement Motion and the original motion to compromise made clear—any and all claims of NGP against TCO and its affiliated entities, without any carve-out for claims such as those asserted in the 2013 State Court Case. Tr. at 61–63.

### E. Sanders's Lack of Good Faith

Good faith is not a defense to a finding of civil contempt, but it may in certain circumstances serve to mitigate the sanctions imposed for the contempt. The Fulson Parties contend that they filed the Complaint in good faith. There is evidence to the contrary, especially as to Sanders. During his testimony, Sanders suggested that NGP and NES had their own claims under the OCPA. Tr. at 79:6–7. If one assumes that NGP had viable claims under the OCPA, then it also would be reasonable to assume that it had claims

under RICO and that NES likewise had claims under both the OCPA and RICO. And during the hearing on the Motion, Sanders testified that he was familiar with RICO and had "done RICO work[.]" Tr. at 71. Yet nothing in the record indicates that he ever brought those claims to the attention of Ransier or, for that matter, McClatchey—even though Sanders had been employed by McClatchey as special counsel to represent the NES estate and even though Sanders received approximately $1 million from the NES estate as a contingency fee on account of his retention as special counsel.[12] This calls his credibility into question.

During his testimony, Sanders suggested that he was aware of and relied upon *Adair v. Wozniak*, 23 Ohio St.3d 174, 492 N.E.2d 426 (1986) while he was in the process of deciding whether filing the Complaint would violate the automatic stay.[13] Tr. at 74–75. He left this impression even though he mentioned *Adair* for the first time in the Sanders Motion, having failed to cite it in the first three documents he filed in this matter, the Fulson Parties Response, their Surreply and the document containing supplemental case law authority. This also calls his credibility into question.

In assessing whether Sanders truly believed that the Fulson Parties were free to file the Complaint despite the pendency of NGP's bankruptcy case and the automatic stay, other testimony of his also bears noting. "I don't fault Mr. Ransier or, for that matter, Mr. McClatchey in either of these two related Nicole cases[,]" he testified. "I have no quarrel with them nor

---

**12.** *See In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 217 n. 10 (Bankr.S.D.Ohio 2008).

**13.** As discussed in the next section, *Adair* applied the common law rule under which a company, not its equity holders, have the right to sue for injuries the company sustains.

*Adair*, 492 N.E.2d at 428. Despite this, Sanders and Lowe cite it for the proposition that Fulson had the right to bring claims on his own behalf based on damages allegedly sustained by NGP.

does Mr. Fulson have any quarrel with their function as a trustee." Tr. at 80. At the time Sanders provided that testimony, objections to the Settlement Motion by both Fulson and Sanders were pending. Far from evidencing "no quarrel" with Ransier and McClatchey, Fulson, in his objection to the Settlement Motion (Doc. 111), described Ransier as a "fraud and a liar" and McClatchey as a "liar[,]" expressing opprobrium consistent with his conduct throughout the NES case. *See Nicole Energy Servs.*, 385 B.R. at 217, 219 & n. 13. And Sanders, rather than supporting Ransier's approach as trustee, argued in his objection to the Settlement Motion (Doc. 112) that "the proposed settlement should not be approved because it is not a reasonable compromise of NGP's claims against TCO." Doc. 112 at 1. He made that same argument during the hearing on the Settlement Motion, which took place the day after the hearing on the Motion. In other words, Sanders's representation on the witness stand that neither he nor Fulson had any "quarrel" with Ransier and McClatchey was diametrically opposed to the positions they took in this case and the NES case. Sanders's capacity to make such plainly contradictory statements with no apparent sense of irony again calls his credibility into question. In short, on several occasions Sanders has exhibited a lack of forthrightness that is inconsistent with his contention that he was proceeding in good faith.

In light of these credibility issues, the Court questions whether Sanders had a good faith belief that filing the Complaint would not violate the automatic stay. In addition, as explained below, the conclusion that filing the Complaint would not violate the automatic stay is contrary to logic, common sense and case law. For all these reasons, filing the Complaint without providing Ransier notice and without requesting the Court grant relief from the automatic stay appears to have been a calculated risk by one who believed it more expedient to ask for forgiveness rather than for permission.

## V. Legal Analysis

### A. The Automatic Stay and Civil Contempt

█ The filing of a bankruptcy petition triggers an automatic stay that puts a halt to all creditor collection efforts and safeguards property of the bankruptcy estate. *See* 11 U.S.C. § 362(a). "There is no question that violation of the automatic stay is a civil contempt of court." *In re Crabtree*, No. 84–5842, 1985 WL 13441, at *3 (6th Cir. June 7, 1985).

█ Parties who take actions in violation of the stay may face sanctions. In seeking the imposition of sanctions here, Ransier relies on § 105(a) of the Bankruptcy Code, which provides that bankruptcy courts may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). *See* Mot. at 1; Ransier Reply at 5–6.[14] "[I]t is firmly established that [t]he power to punish for contempts is inherent in all courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (internal quotation marks omitted). Like

---

14. Section 362(k)(1) of the Bankruptcy Code provides that "an *individual* injured by any willful violation of a stay provided by this section shall recover actual damages including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1) (emphasis added). A split of authority exists on the issue of whether a trustee is an "individual" for purposes of § 362(k)(1), *see In re Nicole Gas Prod., Ltd.*, 502 B.R. 508, 510 (Bankr. S.D.Ohio 2013) (citing cases), but the Court need not decide that issue here.

other courts, bankruptcy courts have the authority to award damages in order to compensate injured parties for the civil contempt of another party. *See, e.g., Liberis v. Craig,* No. 87–5321, 1988 WL 37450, at *8 (6th Cir. Apr. 25, 1988) ("[T]here is no question that the bankruptcy court had the authority to award attorneys' fees against the plaintiffs to compensate the trustee for bringing plaintiffs' contempt to the court's attention."). Under § 105(a), the Court has the authority to use its civil contempt powers to compensate trustees for damages incurred as a result of violations of the automatic stay. *See Havelock v. Taxel (In re Pace),* 67 F.3d 187, 193 (9th Cir.1995). Sanders and Lowe concede that § 105(a) provides the Court with this authority. *See* Sanders Mot. at 5 ("The Court ... does have the authority to issue sanctions for civil contempt under § 105 when a party violates an automatic stay.") and 12 ("[T]his Court ... has the authority to issue sanctions for civil contempt under § 105."); Lowe Mot. at 2 (incorporating the Sanders Motion).

▮ In order to obtain an order of civil contempt, the movant must carry the "burden of proving by clear and convincing evidence that the respondent violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Liberte Capital Grp., LLC v. Capwill,* 462 F.3d 543, 550–51 (6th Cir.2006) (internal quotation marks omitted). The order must be "clear and unambiguous[,]" with "[a]mbiguities ... resolved in favor of the party charged with contempt." *Id.* (citations and internal quotation marks omitted). "[T]he automatic stay is exactly the kind of definite and specific order of the court contemplated by the Sixth Circuit." *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beer-*

*man Stores Corp.*), 197 B.R. 629, 633 (Bankr.S.D.Ohio 1996) (internal quotation marks omitted). To support a finding of contempt in the context of the automatic stay, "[t]he party alleging contempt must show that the defendant had knowledge that the [automatic] stay was in effect and nonetheless took an action in violation of the stay." *TLB Equip., LLC v. Quality Car & Truck Leasing, Inc. (In re TLB Equip., LLC),* 479 B.R. 464, 480 (Bankr. S.D.Ohio 2012).

## B. The Fulson Parties Willfully Violated the Automatic Stay.

### 1. Overview

▮ The evidence shows that the Fulson Parties knew that the automatic stay was in effect in NGP's bankruptcy case when they filed the Complaint and the Amended Complaint, and they do not contend otherwise. Despite this knowledge, the Fulson Parties violated the automatic stay. This conclusion follows from a straightforward application of two provisions of the Bankruptcy Code as well as a fundamental principle of Ohio law. Section 362(a)(3) of the Bankruptcy Code automatically stays attempts to exercise control over property of the estate, and under § 541(a)(1) claims belonging to the debtor as of the commencement of the bankruptcy case are property of the estate. Because the NGP Ohio RICO Claims sought damages solely in Fulson's capacity as the equity owner of the equity owner of NGP on account of injuries sustained by NGP, under Ohio law it was NGP alone—not Fulson in his capacity as an indirect owner of NGP—that had the right to assert those claims before the Petition Date. The NGP Ohio RICO Claims thus became property of NGP's bankruptcy estate by operation of § 541(a)(1) on the Petition Date and, as a result, only Ransier had the right to assert and settle the claims in order to

monetize them on behalf of all creditors. The Fulson Parties thus violated the automatic stay when they asserted the NGP Ohio RICO Claims on behalf of Fulson personally. And because the Bankruptcy Code and Ohio law are definite and specific as applied here, the Fulson Parties' violation of the stay subjects them to liability for civil contempt.

### 2. The Automatic Stay and Property of the Estate

■■■ The automatic stay prohibits, among other things, the "exercise [of] control over property of the estate[.]" 11 U.S.C. § 362(a)(3). Section 362(a)(3)'s reference to "property of the estate" includes "interests of the debtor in property" as of the commencement of the bankruptcy case. 11 U.S.C. § 541(a)(1). As the Sixth Circuit has recognized, "it is well established that 'interests of the debtor in property' include 'causes of action[,]' " *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir.1988), making causes of action existing as of the commencement of the bankruptcy case property of the estate under. § 541(a)(1). *See Parker v. Goodman (In re Parker)*, 499 F.3d 616, 624 (6th Cir.2007). And as the Sixth Circuit also has pointed out, "[i]t is well settled that the right to pursue causes of action formerly belonging to the debtor—a form of property 'under the Bankruptcy Code'—vests in the trustee for the benefit of the estate." *Bauer*, 859 F.2d at 441 (internal quotation marks omitted). The trustee

has the exclusive right to assert those causes of action, *see Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 853 (6th Cir.2002),[15] and any person other than the trustee who asserts them violates the stay. *See Maloof v. Level Propane, Inc.*, 429 Fed.Appx. 462, 468 (6th Cir.2011) (holding that debtors' shareholder and former CEO violated the automatic stay by asserting a cause of action that belonged to the estate).[16] In short, § 362(a)(3) establishes a clear line that parties may not cross.

### 3. Application of § 362(a)(3) in Light of Ohio Law

The Fulson Parties crossed the line established by § 362(a)(3) when they filed the 2013 State Court Case. As the Complaint shows, to the extent they had any validity at all, the NGP Ohio RICO Claims—including those in which Fulson alleged a fraudulent scheme that led to NGP's bankruptcy—arose before the Petition Date, and NGP had the sole right to assert them. *See Warren v. Mfrs. Nat'l Bank of Detroit*, 759 F.2d 542, 545 (6th Cir.1985) ("Where a corporation is defrauded bringing about ultimate bankruptcy, a cause of action exists on the part of the corporation against the wrongdoer."). As a result, the rule that "if the debtor could have raised a state claim at the commencement of the bankruptcy case, then that claim is the exclusive property of the bankruptcy estate" applies to the NGP Ohio RICO Claims. *Honigman v. Comer-*

---

**15.** *See also United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 362 (5th Cir.2014) ("In the bankruptcy context, the bankruptcy trustee is the real party in interest with respect to claims falling within the bankruptcy estate. The bankruptcy trustee therefore has exclusive standing to assert undisclosed claims that fall within the bankruptcy estate.") (citation omitted).

**16.** *See also Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 429 B.R. 423, 430 (Bankr.S.D.N.Y.2010) (holding that a party "violate[s] the stay by usurping causes of action belonging to the estate under sections 362(a)(3) and 541 of the Code"), *aff'd sub nom. Fox v. Picard (In re Madoff)*, 848 F.Supp.2d 469 (S.D.N.Y.2012), *aff'd sub nom. Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81 (2d Cir.2014).

*ica Bank* (*In re Van Dresser Corp.*), 128 F.3d 945, 947 (6th Cir.1997).

*Van Dresser* is particularly instructive here. There, Daniel Honigman, a shareholder and creditor of Van Dresser Corp., filed a state court lawsuit alleging that the defendants caused him over a million dollars in damages by draining funds from two subsidiaries of Van Dresser—Renaissance Manufacturing Company and Van Dresser Corporation/Westland—leading to their own bankruptcies as well as Van Dresser's. *Id.* at 946. The lawsuit was removed to the bankruptcy court presiding over the cases of Van Dresser and its subsidiaries, and the bankruptcy court granted a motion to dismiss Honigman's complaint. *See id.* at 947. "The district court affirmed, holding that Honigman's claim was derivative, that it was the exclusive property of the debtors' estates, and that therefore, he had no standing to sue." *Id.* In affirming as to Honigman's loss, the Sixth Circuit began its analysis with the same principles discussed above—that "the interests of the debtor in property include causes of action" and that "[a] debtor's appointed trustee has the *exclusive* right to assert the debtor's claim." *Id.* (internal quotation marks omitted). "[I]f Honigman had slipped and fallen on a negligently maintained floor at [the] offices [of one of the defendants], he could recover irrespective of his status as [a] Van Dresser shareholder." *Id.* at 948. Obviously, such a slip-and-fall claim is not one that Van Dresser would have brought. But "if Honigman's state claims could have been brought by Van Dresser or its subsidiaries on [the date they commenced their bankruptcy cases], then the plaintiff is barred from [pursuing] them now." *Id.* at 947. The Sixth Circuit concluded that Honigman's lawsuit was barred. *See id.* at 947, 949.

So too was Fulson. The Complaint made clear that Fulson brought the NGP Ohio RICO Claims solely in his capacity as the purported owner of NGP based on actions the Columbia Gas Entities allegedly took to misappropriate NGP's assets and to eliminate NGP as a competitor, and the Surreply confirmed that Fulson believed the settlement with TCO would cause him harm "[a]s a person with an ownership interest in NGP[.]" Surreply at 2. Applicable state law governs the extent of a debtor's interest in property when the Bankruptcy Code does not. *See Drown v. JPMorgan Chase Bank, N.A.* (*In re Barnhart*), 447 B.R. 551, 555 (Bankr.S.D.Ohio .2011). Under longstanding Ohio common law, shareholders have no right to bring claims based on direct injury to the corporation on their own behalf. *See Warren Tel. Co. v. Staton,* 46 Ohio App. 505, 189 N.E. 660, 663 (1933); *Bloom & Co. v. Ray,* 1923 WL 1781, at \*1 (Ohio Ct.App. Mar. 16, 1923). Instead, shareholders may bring such claims, if at all, only on behalf of the corporation through shareholder derivative suits, which "originated [at common law] more than one hundred years ago as actions in equity." *Polikoff v. Adam,* 67 Ohio St.3d 100, 616 N.E.2d 213, 218 (1993).

In *Adair,* the Ohio Supreme Court reiterated the "well-settled [principle] that only a corporation and not its shareholders can complain of an injury sustained by, or a wrong done to, the corporation." *Adair,* 492 N.E.2d at 428. The court then applied this principle in a case where, as here, the company had filed for bankruptcy as a result of the alleged misconduct of the defendants, and the company's shareholders had brought a lawsuit on their own behalf instead of attempting to bring a derivative suit. *See id.* at 427–28. The Ohio Supreme Court held that "wrongful actions by third parties impairing the capital position of the corporation give no

right of action to the shareholders as individuals for damages where there is no violation of duty owed directly to the shareholders." *Id.* at 429.[17] True, impairing the capital position of a company visits "real harm" on the company's equity holders in the form of a "diminution in the value of [their] ownership." *Id.* at 429. But any amount the company itself recovers through litigation or settlement results in a corresponding increase in the value of the shareholders' equity. So the injuries that shareholders suffer as a result of harm to the company are not only indirect, claims on account of those injuries also are duplicative of the company's claims. *See id.* at 429 ("The personal loss and liability sustained by the shareholder is both duplicative and indirect to the corporation's right of action.").

That is, in addition to being indirect, the duplicative nature of the shareholder's claim is a reason the claim must be brought as a derivative action. Because the company's recovery redresses the equity holders' indirect injuries, the equity holders may pursue claims for the damages sustained by the company only derivatively, and only if the company does not assert or settle the claims. Yet bringing an action against the Columbia Gas Entities on his own behalf for damages allegedly sustained by NGP is precisely what Fulson did when he brought the NGP Ohio RICO Claims.

Under Ohio law, then, the NGP Ohio RICO Claims belonged to NGP, and any claims Fulson had were derivative of NGP's claims against the Columbia Gas Entities. "[R]ights derivative from the debtor's causes of action constitute an interest in property that the estate acquires." *Parker,* 499 F.3d at 624. Thus, like the claims asserted by the shareholder in *Van Dresser,* the NGP Ohio RICO Claims asserted by Fulson were property of NGP's estate. *See City Sanitation v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.),* 656 F.3d 82, 90 (1st Cir.2011) ("[T]he harm was to the debtor, and these claims must be considered part of the debtor's estate. This point is reinforced by an examination of the state court complaint, which only describes harm inflicted upon the debtor, its customers, and its assets. As to City, the harm alleged is derivative and indirect."). Fulson accordingly was barred—and his probate estate is barred—from pursuing the NGP Ohio RICO Claims.

Sanders and Lowe—and before his death, Fulson—clearly wanted to try the NGP Ohio RICO Claims before a jury in the State Court. *See* Surreply at 2–3 ("[T]he RICO claims arise ... from the different standards applied by bankruptcy courts in approving compromises and by the finder of fact in a civil action.").[18] But even if Ransier had not attempted to stop them when he did by filing the Stay Notice, applicable Ohio law would have re-

**17.** *See also Boedeker v. Rogers,* 140 Ohio App.3d 11, 746 N.E.2d 625, 632–33 (2000) (citing *Adair* for the proposition that "[w]here the basis of the action is a wrong to the corporation, redress must be sought in a derivative action"); *Henkel v. Aschinger,* 167 Ohio Misc.2d 4, 962 N.E.2d 395, 402, 403 (Ohio Ct. Common Pleas 2012) (citing *Adair* and stating that "[w]here a corporation is harmed by alleged wrongdoing and the shareholders are indirectly injured, the claim is derivative in nature").

**18.** During the hearing on approval of the APA between McClatchey and the Columbia Gas Entities, Sanders testified that "[j]uries don't like utility companies" and that when "I can stand before a jury of ordinary people and say you've got this big corporation that gave this man no credit, zero, for two years, then I think I get a jury verdict." *Nicole Energy Servs.,* 385 B.R. at 251–52.

quired the State Court—before the matter reached a jury—to conclude that the NGP Ohio RICO Claims were property of NGP's estate and that only Ransier could assert or settle them. In a case where a shareholder of bankruptcy debtor Columbus Microfilm brought a breach of contract action in her capacity as shareholder, the Ohio court of appeals affirmed the summary judgment granted against her by the State Court on the basis that "only a corporation and not its shareholders can complain of an injury sustained by, or wrong done to, the corporation." *Granata v. Stamatakos*, No. 13AP–424, 2013 WL 6708412, at *4 (Ohio Ct.App. Dec. 17, 2013). The Ohio court of appeals held that the trustee in the Columbus Microfilm bankruptcy was the real party in interest and that the plaintiff thus lacked standing to bring the claim on its behalf. *Id.*[19] Likewise, in *Huntington National Bank v. Weldon F. Stump & Co.*, No. L–06–1398, 2008 WL 1921742 (Ohio Ct.App. May 2, 2008), the court of appeals held that the sole shareholder of the debtor "had no standing to bring an action against [the defendant] for losses he has or may sustain[,]" and that "[a]ny cause of action ... now lies exclusively with the trustee in bankruptcy[,]" *Id.* at *4. The same is true in the NGP case, and there is no reason to believe that the State Court would hold otherwise.

■■■ The general rule under which only the corporation can assert a claim does not apply if "the complaining shareholder is injured in a way that is separate and distinct from [the] injury to the corporation." *Crosby v. Beam*, 47 Ohio St.3d 105, 548 N.E.2d 217, 219 (1989); *see also Van Dresser*, 128 F.3d at 948. During the hearing on the Motion, therefore, the Court asked Lowe's counsel if he could identify anything in the Complaint or the Amended Complaint "that alleges injury to Mr. Fulson that's not derivative of injury to the corporation[,]" or "that alleges injury to Mr. Fulson that's separate and independent from injury to NGP[.]" Tr. at 14–15. Lowe's counsel was not able to identify any separate injuries, nor was anyone else on behalf of the Fulson Parties. The reason for this is simple—the NGP Ohio RICO Claims are based on no injury that Fulson experienced separate and independent of the alleged injury to NGP. This leaves no doubt that the filing of the Complaint and the Amended Complaint was an attempt to exercise control over property of NGP's estate.

#### 4. Ransier's Settlement With TCO Does Not Permit Fulson to Assert the NGP Ohio RICO Claims.

The fact that Ransier is settling the NGP Ohio RICO Claims for less than the amount the Fulson Parties assert they are worth rather than litigating with the Columbia Gas Entities does not change the conclusion that Fulson had no right to assert the claims. As established above, Ransier has the exclusive right to attempt to monetize the NGP Ohio RICO Claims. "Only if [Ransier] truly abandon[ed] the[ ] claims ... may [Fulson pursue] them in state court." *Van Dresser*, 128 F.3d at 949. And Ransier has not abandoned the bankruptcy estate's claims against the Columbia Gas Entities, but instead is settling them, converting them to $250,000 in cash for distribution to creditors. In *Van Dresser*, the bankruptcy court approved a settlement between one of the defendants and the bankruptcy trustees for Van

---

**19.** The court of appeals held that the "existence of a single shareholder" (Fulson is the sole shareholder of NGM and NEM, one of which was the sole owner of the equity in NGP) does not change the general rule that the claim belongs only to the corporation. *Id.* at *4.

Dresser's subsidiaries. *See id.* at 947. Rather than holding that the shareholder could sue the defendant after the settlement was approved, the Sixth Circuit held that the shareholder, who was also a creditor, "must recoup whatever portion he can of [his damages] from the bankrupt estates." *Id.* at 949.

Given that Fulson withdrew his claim against NGP, *see* Agreed Order (Doc. 165), he is not entitled to a distribution from NGP's bankruptcy estate. Nonetheless, he had no right to assert—nor does his probate estate—the claims that Ransier is settling any more than did the shareholder in *Van Dresser*, where the Sixth Circuit held that "[t]he [bankruptcy] estates' recovery takes precedence over [the shareholder's]." *Van Dresser*, 128 F.3d at 949. This is because derivative claims of shareholders belong "exclusively to the [debtor's bankruptcy] Estate and [are] extinguished by its settlement of those claims." *Sobchack v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 17 F.3d 600, 604 (2d Cir.1994).

This is not a rule without a reason. If derivative shareholder claims were not extinguished by the trustee's settlement of the estate's claims, then a defendant facing a claim for injuries to a corporate entity that indirectly harmed shareholders and creditors would always face the possibility of either settling with each and every one of them or, failing that, paying the full amount for which the stakeholders collectively assert the defendant is liable. Not infrequently, direct harm to a company leads to indirect injury to the company's stakeholders: equity holders' investments decline in value, creditors go unpaid, and employees lose their jobs. "Allowing every shareholder, employee and creditor a cause of action for injuries derivative of those suffered directly by a corporation" would not only "create[ ] a potential avalanche of suits that previously could not have been brought *at all[,]*" *Warren*, 759 F.2d at 545, it likewise would make it impracticable (if not impossible) for companies—and trustees of the estates of the companies once they enter bankruptcy—to settle claims against third parties. Trustees would find third parties unwilling to settle due to the possibility that employees, creditors and shareholders might disagree with the settlement terms and seek to bring their own lawsuits. For that reason, orders approving settlements often contain injunctions against the pursuit of claims that are derivative of claims of the debtor.[20]

TCO insists on such an injunction here. As noted above, after TCO became aware of the 2013 State Court Case, it agreed to pay the settlement amount of $250,000 only if the Court not only approved the Settlement Motion, but also enjoined any entity from pursuing derivative claims and other claims that are property of NGP's bankruptcy estate. This approach facilitates settlement, an important goal in light of the fact that "[f]ully litigating a ... claim could easily exhaust assets that would otherwise go to creditors," making it all the more crucial that "the person vested with responsibility for deciding whether to settle or fight is the trustee, not the debtor" or a direct or indirect shareholder of the debtor. *Bauer*, 859 F.2d at 441.

Another good reason exists for prohibiting stakeholders from usurping the sole

---

**20.** *Sec. Investor Prot. Corp. v. Madoff Inv. Sec. LLC*, Case No. 08–1789, 2011 WL 10549389 (Bankr.S.D.N.Y. Jan. 13, 2011), *aff'd sub nom. Fox v. Picard (In re Madoff)*, 848 F.Supp.2d 469 (S.D.N.Y.2012), *aff'd sub nom. Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81 (2d Cir. 2014); *Griffin v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 805 F.2d 1515, 1518 (11th Cir.1986).

right of a trustee to settle claims the debtor has against third parties. Allowing an equity holder—or, as in this case, an indirect equity holder—who is unhappy with a settlement to bring his or her own lawsuit against the counterparty to the settlement would violate the priority scheme established by the Bankruptcy Code. *See Hamid v. Price Waterhouse,* 51 F.3d 1411, 1420 (9th Cir.1995) ("When a creditor suffers injury that is independent of the firm's fate, his injury is direct and he may pursue his own remedy; otherwise the injury is derivative and the creditor must take his place in line as a creditor in the bankruptcy action.") (internal quotation marks omitted).

If Fulson had been permitted to prosecute the 2013 State Court Case on his own behalf, creditors of NGP's estate would recover only cents on the dollar from the settlement between Ransier and TCO while Fulson—an equity holder of an equity holder of NGP—would have pursued full recovery for himself. And if Fulson had somehow recovered damages on account of the NGP Ohio RICO Claims, he would have been required to turn them over to Ransier on behalf of NGP's estate, a result apparently not contemplated by the Fulson Parties. *See In re Mercedes Homes, Inc.,* 431 B.R. 869, 877 (Bankr. S.D.Fla.2009) ("[B]ecause any derivative action is an asset of the Debtors' estates, any recovery on account of a successful action would be payable to the Debtors' estates, rather than to the Objecting ESOP Participants."). But if that happened, could Ransier take the money and distribute it to creditors of NGP's estate? Not if he wanted to avoid a lawsuit for breach of the settlement agreement he entered into with TCO. In other words, permitting the 2013 State Court Case to continue would place Ransier in the untenable position of either breaching his settlement agreement with TCO or standing by while the Fulson Parties violated the priorities established by the Bankruptcy Code.[21]

In sum, the rationale for concluding that the Fulson Parties violated the automatic stay is straightforward. Under Ohio law, only NGP—not Fulson—had the right to assert claims for injuries sustained by NGP, so the NGP Ohio RICO Claims were NGP's property before its bankruptcy. Because the NGP Ohio RICO Claims were NGP's property, § 541(a)(1) made them property of NGP's bankruptcy estate on the Petition Date. And because the claims were property of NGP's estate, § 362(a)(3) prohibited the Fulson Parties from asserting them. To hold otherwise would be inconsistent with the Bankruptcy Code and Ohio law. As applied here, §§ 362(a)(3) and 541(a)(1), as well as Ohio law, are definite and specific, clear and unambiguous. The Fulson Parties accordingly have willfully violated the automatic stay.

## C. The Fulson Parties' Counterarguments Are Unavailing.

In the face of this well-established law and its clear applicability to the facts of this case, the Fulson Parties assert five arguments for why they should not be held in contempt.[22] In three of those argu-

---

**21.** Equity holders also are below creditors in priority under Ohio law. *See* Ohio Rev.Code Ann. § 1705.46 (West 2014) (upon dissolution of limited liability company, assets are distributed to members only if there are assets remaining after distribution to creditors); Ohio Rev.Code Ann. § 1701.882(B) (upon dissolution of corporation, assets are distributed to shareholders only if there are assets remaining after distribution to creditors). Thus, the rule prohibiting stakeholders from usurping the right to settle claims the company has against third parties also applies with equal force outside of bankruptcy.

**22.** The Sanders Brief and the Lowe Brief expressly make the same five arguments. The

ments they contend that the NGP Ohio RICO Claims are not property of NGP's estate. In the other two they argue that they should not be held in contempt even if the NGP Ohio RICO Claims are property of NGP's estate. None of these arguments has any merit.

### 1. The NGP Ohio RICO Claims Are Property of NGP's Estate Notwithstanding the Fulson Parties' Arguments to the Contrary.

### a. The Argument Based on the OCPA

 No one could disagree that the principle of Ohio common law under which equity holders are prohibited from usurping the company's right to assert claims for injuries it sustained is longstanding and fundamental—and yet, according to the Fulson Parties, the Ohio legislature intended to brush that principle aside with the enactment of the OCPA in 1985. But "[s]tatutes are to be read and construed in the light of and with reference to the rules and principles of the common law in force at the time of their enactment[.]" *Mann v. Northgate Investors, L.L.C.*, 138 Ohio St.3d 175, 5 N.E.3d 594, 599 (2014) (citing *State ex rel. Morris v. Sullivan*, 81 Ohio St. 79, 90 N.E. 146 (1909)). And "in giving construction to a statute the legislature will not be presumed or held, to have intended a repeal of the settled rules of the common law *unless the language employed by it clearly expresses or imports such intention.*" *Id.* (emphasis added).[23] One way for the Ohio legislature to have

clearly expressed an intent to override the common law rule would have been to state something to the effect that "equity holders may bring claims under this section on their own behalf based on injuries sustained by the company of which they are equity holders." The language used in the OCPA does not come close to being such a clear statement of legislative intent. In fact, for the reasons explained below, the Court concludes that the OCPA evidences no intent whatsoever on the part of the Ohio legislature to override Ohio law prohibiting equity holders from bringing a lawsuit on their own behalf to recover for injuries sustained by a company.

Under the OCPA,

any person directly or indirectly injured by conduct in violation of section 2923.32 of the Revised Code or a conspiracy to violate that section, other than a violator of that section or a conspirator to violate that section ... shall have a cause of action for triple the actual damages the person sustained. To recover triple damages, the plaintiff shall prove the violation or conspiracy to violate that section and actual damages by clear and convincing evidence. Damages under this division may include, but are not limited to, competitive injury and injury distinct from the injury inflicted by corrupt activity.

Ohio Rev.Code Ann. § 2923.34(E). In support of their argument that the OCPA permits Fulson to assert the NGP Ohio

---

Fulson Brief incorporates those arguments by reference. Fulson Br. at 1. In addition, Fulson asserts that he should not be held in contempt because he obtained legal advice from Sanders and one of his other attorneys, Clifford O. Arnebeck, Jr., to the effect that his filing the 2013 State Court Case was permissible. *See* Fulson Br. at 1–3. Sanders and Lowe agree that, if anyone should be held in contempt, it should be Sanders. *See* Sanders Br. at 19–20; Lowe Br. at 19–20.

**23.** *See also United States v. Texas*, 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) (holding that "[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident").

RICO Claims, Sanders and Lowe rely on three phrases in section 2923.34(E): "any person," "indirectly injured" and "injury distinct from the injury inflicted by corrupt activity." Sanders Br. at 4–5; Lowe Br. at 3–4. None of these phrases supports their position. To the contrary, logic, common sense and case law all demonstrate that their reasoning is faulty.

### i. The Fulson Parties' Argument Defies Logic.

 While the words "any person" in and of themselves are "terms of unlimited extent[,]" *United States v. Palmer,* 16 U.S. 610, 631, 3 Wheat. 610, 4 L.Ed. 471 (1818), such "general words must ... be limited ... to those objects to which the legislature intended to apply them." *Id.* Or, as the Sixth Circuit has so aptly put it, "milieu limits the reach of general words" such as the words "all" or "any." *Russell v. Citigroup, Inc.,* 748 F.3d 677, 681 (6th Cir.2014) (citing *Palmer*). Properly understood, a statute providing that any injured person may bring a claim does not necessarily mean that each and every injured person may do so without limitation, any more than saying that everyone is welcome to attend a gathering means that the host will permit the number of visitors to exceed the number permitted by applicable zoning and fire codes. Continuing the analogy, if a directly injured company—or, in bankruptcy, the company's trustee—seeks to assert or settle a claim under the OCPA against a third party, then there is no room for the company's equity holders to do so as well. For example, in *Warren,* the sole shareholder of the company argued that he had standing to bring a claim against a third party for harm to the company under the "any person" language of the federal Racketeer Influenced

and Corrupt Organizations Act ("RICO"). The Sixth Circuit rejected the argument, *Warren,* 759 F.2d at 544, and the Court likewise must reject the argument that the "any person" language of the OCPA has the effect the Fulson Parties seek to give it.

Sanders and Lowe themselves make an argument predicated on the understanding that the words "any person" are not unlimited in their reach. They contend that NGP's agreement with TCO means that NGP was limited to asserting contractual claims against TCO and that it therefore could not have asserted its own claims under the OCPA. *See* Sanders Br. at 16 ("The Debtor, being in contractual privity with TCO, is limited to contract remedies."); Lowe Br. at 14 (same).[24] The cases on which Sanders and Lowe rely in their post-hearing briefs stand for nothing of the sort, but instead merely reiterate the unremarkable principle that a breach of contract claim does not constitute a tort claim—a principle wholly inapplicable here given that the NGP Ohio RICO Claims assert more than a breach of contract by TCO. But NGP is a person within the meaning of the OCPA, so Sanders and Lowe could not even make this argument if the phrase "any person" means what they say it does. For if the words "any person" have the meaning Sanders and Lowe suggest, then NGP should have its own claim under the OCPA regardless of whether it also possesses a separate breach of contract claim against TCO. The statute simply does not have the meaning they seek to give it. Nothing in the OCPA's use of the phrase "any person" evidences an intent on the part of the Ohio

24. They do so even though Sanders suggested during the hearing that NGP had its own claims under the OCPA. Tr. at 79:6–7.

legislature to upend the longstanding principle of Ohio law discussed above.

Nor does the OCPA's use of the phrases "indirectly injured" or "injury distinct from the injury inflicted by corrupt activity" suggest such an expansive intent on the part of the legislature. As already discussed, the Ohio Supreme Court's *Adair* decision supports the view that the NGP Ohio RICO Claims are derivative of NGP's claims against the Columbia Gas Entities and therefore cannot be asserted by Fulson. Yet Sanders and Lowe attempt to find support for their own position in *Adair*, noting that the Ohio Supreme Court stated in that decision that where a defendant's actions have caused direct injury to a corporation, " '[t]he personal loss and liability sustained by the shareholder is both duplicative *and indirect* to the corporation's right of action.' " Sanders Br. at 6 (quoting *Adair*, but adding emphasis); Lowe Br. at 5 (same). This language should sound familiar; the Court already analyzed it in concluding that Fulson had no right to bring the NGP Ohio RICO Claims. Sanders and Lowe, though, misuse the passage. They ignore *Adair*'s use of the word *duplicative.* They then extract from the passage the word *indirect* and, playing the sophist's game, insert it into this flawed syllogism: (1) the Ohio Supreme Court held in *Adair* that an injury incurred by a shareholder based on injury to the corporation is an *indirect injury* (major premise), and (2) under the OCPA, *any indirectly injured* person may assert a cause of action, even if the indirect injury is derivative of harm to another (minor premise), therefore (3) under the OCPA, shareholders may bring claims on their own behalf based on indirect injury to the corporation. *See* Sanders Mot. at 10; Sanders Br. at 5–6; Lowe Br. at 5.

The syllogism is flawed because, while the major premise is unassailable, the minor premise is simply false. It is not true that *any indirectly injured* person may bring a claim under the OCPA even if the indirect injury is derivative of harm to another. As already discussed, the phrase "any person" must be limited by its "milieu," *Russell*, 748 F.3d at 681, including longstanding, fundamental principles of law that the Ohio legislature evidenced no intent to overturn. *See Warren*, 759 F.2d at 545 ("[S]tatutes are to be interpreted with reference to the common law. . . .") (internal quotation marks omitted). One of those principles is the previously discussed "well-settled [rule] that only a corporation and not its shareholders can complain of an injury sustained by, or a wrong done to, the corporation." *Adair*, 492 N.E.2d at 428. This principle is grounded not only on the fact that injuries shareholders incur as a result of harm to the company are indirect, but also on the fact that the claims on account of those injuries are "duplicative [of] the corporation's right of action." *Id.* at 429. There is no reason to believe that a plaintiff may bring an indirect claim under the OCPA if there is a bar to bringing the claim—such as its duplicative nature—other than the claim's indirectness. To the extent indirectness is a bar to recovery, the OCPA may remove it, but it does nothing to remove the bar erected by the principle that shareholders have no right of recovery on claims that are derivative and duplicative of claims held by the corporation. Quite simply, Sanders and Lowe ignore the word *duplicative* that appears in the very same sentence of *Adair* on which they rely.

### ii. The Fulson Parties' Argument Defies Common Sense.

While simple logic shows the unsoundness of the Fulson Parties' reasoning, common sense also demonstrates it. Imagine a regulation that permits only those vehi-

cles whose owners pay a fee to use the *direct* route to certain sections of a state park, but that permits other vehicles to use a more difficult *indirect* route. A visitor to the park approaches a booth from which the two access points diverge, and a law enforcement officer in the booth informs him of the state regulation. The visitor refuses to pay the fee (and does so in such a forceful way that the officer is sure to remember him). Believing that his vehicle will be unable to navigate the difficult terrain of the indirect route, the visitor turns around, goes back to a parking lot in the front of the park and steals a four-wheel-drive vehicle. The visitor then enters the indirect route, but the law enforcement officer spots him and becomes suspicious. The officer calls for assistance, and the visitor ultimately is stopped before arriving at his destination. Upon being arrested for automobile theft, the visitor protests: "But the state regulation allows me to take the indirect route, and that is what I was doing." No reasonable person would interpret the regulation in this way—as permitting the visitor to ignore other state laws, such as the law against larceny, merely because he was taking the indirect route the state regulation otherwise permitted him to take. But that essentially is how Sanders and Lowe are interpreting the OCPA. According to them, the use of the word *indirect* permitted Fulson to usurp the NGP Ohio RICO Claims from NGP's estate and to assert them on his own behalf in order to arrive at his destination of a recovery for himself while flouting well-established state common law that prohibited him from doing so.

### iii. The Fulson Parties' Argument is Contrary to Applicable Case Law.

Despite all this, the Fulson Parties still contend that the mere use of the word "indirectly" in the OCPA provided Fulson the right to bring what is clearly a derivative claim of an equity holder as a direct claim, Sanders Br. at 12–13; Lowe Br. at 10–11; or as counsel to Lowe put it during the hearing on the Motion, "oddly enough a direct claim based on indirect damages[.]" Tr. at 14. That conclusion, however, is contrary to a decision by an Ohio court of appeals as well as persuasive authority from another jurisdiction.

In *Cleveland v. JP Morgan Chase Bank, N.A.*, No. 98656, 2013 WL 1183332 (Ohio Ct.App. Mar. 21, 2013), the City of Cleveland sought damages under the OCPA from certain financial institutions, alleging that they had obtained title to real property through foreclosure by "systematically fil[ing] false or misleading paperwork in foreclosure cases indicating that they were entitled to initiate foreclosure actions when they were not." *Id.* at *1. The City argued that the foreclosures "led to greatly diminished housing prices, which resulted in huge losses in property taxes...." *Id.* These losses, of course, constituted indirect injury to the city. But according to the court of appeals, a "reduction in property values [is] more acutely suffered by those who lost homes through foreclosure and those living in foreclosure-ravaged neighborhoods[,]" and a "loss in tax revenue from decreasing property values is a derivative injury to that suffered by property owners." *Id.* at *5. And given that the mortgagors were in default, the foreclosures "would only [have] be[en] delayed, not extinguished" if the defendants had refrained from filing false or misleading documents in foreclosure cases, because some financial institution likely would have been entitled to foreclosure even if one of the defendants was not. *Id.* at *8. Thus, the foreclosures had "caused no damages to the City individually that would not have befallen it without any impropriety." *Id.* at *9. In the final analysis, the court of

appeals affirmed the trial court's dismissal of the city's OCPA cause of action for failure to state a claim "because the City's injuries are derivative of the injuries suffered by the individuals whose properties were foreclosed upon." *Id.* at *8. The lesson of *JP Morgan Chase Bank* is clear: a plaintiff may not bring an indirect claim under the OCPA if there is a bar to bringing the claim other than the claim's indirectness.

Faced with this decision by the Ohio court of appeals, Sanders and Lowe simply ignored it in the Sanders Brief and the Lowe Brief. Previously, they criticized it for containing "no discussion of the unique standing provisions of the OCPA[.]" Sanders Mot. at 10 n.1; Lowe Mot. at 2 (incorporating the Sanders Motion). But the appeals court presumably read the statute it was applying. And this Court cannot accept the Fulson Parties' contention that the decision is "plainly incorrect[,]" *id.*, especially given the principle previously enunciated by the United States Supreme Court and the Sixth Circuit that "a decision of an Ohio appeals court ... must not be disregarded unless there exists ' "other persuasive data that the highest court of the state would decide otherwise." ' " *Rhiel v. Cent. Mortg. Co. (In re Kebe )*, 469 B.R. 778, 790 (Bankr.S.D.Ohio 2012) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940) and citing Sixth Circuit case law). For all the reasons discussed above, no persuasive data suggests that the Ohio Supreme Court would decide that a shareholder may bring a derivative claim on his own behalf merely because a statute provides a cause of action to indirectly injured persons.

Not only that, but the only decision addressing the issue in the shareholder context rejected the argument being made by the Fulson Parties. *See Kelley v. Thompson–McCully Co., LLC,* No. 236229, 2004 WL 1676760 (Mich.App. July 27, 2004). *Kelley* involved a Michigan statute that, like the OCPA, provides indirectly injured persons with a cause of action. In particular, section 8(2) of the Michigan Antitrust Reform Act ("MARA") provides that "[a]ny ... person threatened with injury or injured directly or indirectly in his or her business or property by a violation of this act may bring an action for ... actual damages sustained by reason of a violation of this act...." Mich. Comp. Laws Ann. § 445.778(2) (West 2014). Relying on MARA, Paul Kelley, a shareholder of the West Shore Construction Company, brought a lawsuit alleging that the defendants had conspired to eliminate West Shore as a competitor in the asphalt paving industry, just as Fulson alleged that the Columbia Gas Entities engaged in a scheme to eliminate NGP as a competitor. And just as Sanders and Lowe do on behalf of Fulson, Kelley argued that, even though West Shore was the directly injured party, MARA's "use of the term 'indirectly' mean[t] that [as a shareholder of West Shore] he is a real party in interest for purposes of this antitrust action." *Id.* at *7.

In affirming the trial court, the appeals court disagreed with Kelley's interpretation of MARA, concluding that the Michigan legislature did not intend to overturn longstanding law regarding derivative claims: "The Legislature did not intend to establish in § 8(2) an expansive gateway through which parties with attenuated and derivative claims of injury could file an antitrust action." *Id.* Rather, the Michigan legislature had a more limited intent: to create a "cause of action for indirect purchasers[,]" that is, those purchasers "who bought an illegally monopolized ... product or service [from] a dealer, distributor, or some other independent reseller who was not a participant in the antitrust

violation[.]" *Id.* at *7 & n. 5 (internal quotation marks omitted). The appeals court concluded that, while West Shore may have been a purchaser, "plaintiff is not West Shore." *Id.* at *5. And because any injury Kelley suffered was derivative of any injury to West Shore, *id.* at *3, "[g]iven the existence of the bankruptcy proceedings, West Shore's claim now belongs to the trustee in bankruptcy[,]" so that "the bankruptcy trustee is the real party in interest with respect to the claims of alleged anticompetitive behavior." *Id.* at *2. The court so held despite MARA's providing a cause of action to any person injured directly or indirectly. The result must be the same in NGP's case.

The OCPA cases on which the Fulson Parties rely are not to the contrary. In the *Iron Workers* line of decisions,[25] union health insurance trusts brought OCPA claims against tobacco companies and other entities for the allegedly smoking-related medical expenses the trusts had paid on behalf of their insureds. The trusts brought the claims even though any injuries they had incurred as a result of paying the medical expenses was only indirectly caused by the defendants, with the direct injuries being those of the insureds. The defendants moved to dismiss for failure to state a claim upon which relief can be granted on the ground that the trusts "were not directly injured and cannot bring a direct action." *Iron Workers*, 23 F.Supp.2d at 786.

The district court denied the motion on the basis that the OCPA provides a cause of action to indirectly injured persons. Significantly, the trusts did "not seek personal injury damages, such as pain and suffering or wrongful death damages[,]" *id.* at 790, which were the kinds of damages that the insureds would have been seeking (if any) given that their medical expenses had been paid by the trusts. Compensating smokers for their personal injuries would not compensate the trusts for the medical bills they paid. The district court, therefore, found that "[w]hile related, ... [the trusts'] injuries are distinct from the personal injury claims of smokers." *Id.* at 791. The claims asserted by the trusts for medical expenses were not duplicative of the personal injury claims of the insureds, so both the trusts and the insureds were entitled to assert claims. That makes *Iron Workers* distinguishable from the case before the Court, where the claims Fulson asserts as a shareholder of NGP (actually, as an indirect shareholder) based on injury to NGP are duplicative of NGP's claims.

Further, *Iron Workers* is distinguishable from the *JP Morgan Chase Bank* case on which the Court relied above for the proposition that a plaintiff may not bring an indirect claim under the OCPA if there is a bar to bringing the claim other than the claim's indirectness. As already discussed, in *JP Morgan Chase Bank* a grounds for dismissal existed based on something other than the indirect nature of the city's injuries (i.e., the finding that the city would have suffered injury even if the defendants had not filed false or misleading documents in foreclosure cases). By contrast, after the district court determined in *Iron Workers* that the indirect nature of an injury could not constitute a bar to recovery under the OCPA, it saw no other reason to dismiss the OCPA claims.

The Fulson Parties next contend that "[u]nder [Ransier's] reading of the statute, the term 'indirectly' is given no meaning." Sanders Br. at 6; Lowe Br. at 5. Not so.

---

**25.** *Iron Workers*, 23 F.Supp.2d at 771–97; *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 29 F.Supp.2d 801 (N.D.Ohio 1998); *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 29 F.Supp.2d 825 (N.D.Ohio 1998).

As was the case with the statute at issue in *Kelley,* the use of the word "indirectly" in the OCPA has meaning even if it is not given the overexpansive interpretation proposed by the Fulson Parties. In fact, the very OCPA cases on which Sanders and Lowe rely illustrate this point as clearly as any hypothetical the Court could construct. In *Iron Workers,* the district court acknowledged that there were "substantial grounds for difference of opinion" as to whether the trusts could bring claims under RICO, but that in light of the phrase "indirectly injured" in the OCPA, the defendants had no plausible argument that they were entitled to dismissal of the trusts' complaint for failure to state a claim under the OCPA. *Iron Workers,* 29 F.Supp.2d at 835; *see also CSAHA/UHHS v. Aultman Health Found.,* No. 2010CA00303, 2012 WL 750972 at *10 (Ohio Ct.App. Mar. 5, 2012) ("Given Ohio's recognition of recovery for indirect injury—which is broader than the comparable federal RICO requirement—we find the evidence was sufficient to support the jury's inference/conclusion [that] Aultman's pattern of corrupt activities proximately caused damage to Mercy."). Thus, the Fulson Parties are simply wrong when they assert that the word *indirectly* has no meaning in the OCPA if it does not permit shareholders to bring claims on their own behalf based on harm to the corporation. As *Iron Workers* and *Aultman Health* illustrate, the work that the phrase "indirectly" does in the OCPA is to permit claims for indirect injuries to be brought that might not be permitted under RICO. The OCPA accomplishes that work without opening up an "expansive gateway through which parties with . . . derivative claims of injury [can] file[.]" *Kelley,* 2004 WL

1676760, at *7. In sum, the entire body of relevant case law is contrary to the position taken by the Fulson Parties.

### b. The Argument Based on the Settlement With TCO

The Fulson Parties argue that the NGP Ohio RICO Claims will not accrue until after Ransier, on behalf of NGP, provides the Columbia Gas Entities with a global release as part of the settlement with TCO—at which point NGP's estate will no longer be permitted to assert claims against the Columbia Gas Entities—and that the 2013 State Court Case therefore does not attempt to exercise control over property of NGP's estate. *See* Sanders Br. at 2; Lowe Br. at 1. That argument ignores the derivative nature of the claims asserted in the 2013 State Court Case. It also is inconsistent with the Sixth Circuit's pronouncement in *Van Dresser* that a party seeking to assert claims based on harm to a company must, if the injured company is in bankruptcy and the trustee has settled the claims, recoup whatever portion the party is entitled to recover from the settlement funds and other assets of the bankrupt estate. Rather than giving rise to the NGP Ohio RICO Claims, the Court's approval of the Settlement Motion will effectuate a settlement of those purported claims. Further, none of the cases on which Sanders and Lowe rely support their argument that Ransier's releasing NGP's claims against the Columbia Gas Entities will cause claims in favor of Fulson to accrue.[26] The reason these cases are unavailing is that, while the NGP Ohio RICO Claims are based on Fulson's status as an indirect equity holder of NGP for injury sustained by NGP and therefore are derivative claims, the plaintiffs in the cases

---

26. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 768–69 (2d Cir.1994); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1101 (2d Cir.1988); *Goldin v. Primavera Fam-* *ilienstiftung TAG Assocs. (In re Granite Partners, L.P.),* 194 B.R. 318, 325 (Bankr.S.D.N.Y. 1996).

Sanders and Lowe cite were not asserting derivative claims.

In support of their argument that the NGP Ohio RICO Claims do "not seek property of the estate because [the] claims will not accrue, if they accrue at all, until after [NGP] provides TCO with a global release and can no longer assert any claims of its own[,]" Sanders and Lowe rely extensively on *Bankers Trust.* Sanders Br. at 2; Lowe Br. at 1. *See also.* Sanders Br. at 10–11, 14–15; Lowe Br. at 8–10, 13–14. In that case, Bankers Trust Company ("Bankers") sued Daniel Rhoades, Herman Soifer and Milton Braten, who were the shareholders, directors and officers of Braten Apparel Corporation ("BAC"). *See Bankers Trust,* 859 F.2d at 1098. The trio had filed a voluntary Chapter 11 petition on behalf of BAC after having agreed to transfer a BAC subsidiary with net assets exceeding $3 million to Soifer in a sham transaction in which Soifer would later transfer the subsidiary back to BAC after confirmation of its Chapter 11 plan. All three men—with Rhoades acting as BAC's Chapter 11 counsel—misrepresented the nature of the transaction to Bankers and the other creditors in connection with the plan confirmation process. *See id.* at 1098. Relying on those misrepresentations, Bankers consented to a plan under which it received a distribution of only 17.5% on its more than $4 million claim. Had it known of the true nature of the transaction, Bankers would have insisted on a higher recovery and would have opposed confirmation of BAC's Chapter 11 plan. *Id.* at 1098–99.

After the sham nature of the transaction was uncovered, BAC's bankruptcy proceeding resumed, and the bankruptcy court revoked confirmation of its plan. *Id.* at 1099. Bankers sued Rhoades, Soifer and Braten in the district court under RICO, and the district court dismissed its complaint for lack of standing and for untimeliness under the statute of limitations. *See id.* Reversing the district court, the Second Circuit concluded that Bankers had standing to bring the suit because its RICO claim based on the misrepresentations the three men had made to it— misrepresentations that resulted in Bankers receiving much less on its claim than it otherwise would have—"d[id] not seek recovery for injuries suffered by BAC; but for injuries [Bankers] suffered directly." *Id.* at 1101. "Defendants' conduct . . . caused Bankers monetary damage, and the right to recover for that injury belongs, not to BAC or its bankrupt estate, but to Bankers." *Id.* Of course, to the extent the trustee of BAC's bankruptcy estate recovered anything from the defendants on account of their fraudulent transfers of BAC's assets, such a recovery would make more assets available for the trustee to distribute to all of BAC's creditors, including Bankers. And recovering more from BAC's estate would reduce Bankers's claims against Rhoades, Soifer and Braten to the extent those claims were for the difference between the amount Bankers's would have received under BAC's Chapter 11 plan if the three had not committed fraud and the amount Bankers had in fact received. *See id.* at 1101, 1106. The Second Circuit, therefore, held that Bankers's claims were not untimely under the statute of limitations because the claims would accrue only after the trustee had finished attempting to recover from Rhoades, Soifer and Braten. *See id.* at 1106.

After BAC's trustee was finished pursuing the three, Bankers would be free to pursue the defendants. *See id.* But that was only because Bankers's claims were not derivative of BAC's. In fact, quoting the Sixth Circuit's decision in *Warren* (which the Court discussed above), the Second Circuit expressly distinguished the *Bankers Trust* case from one of its own

prior decisions. In a passage Sanders and Lowe fail to mention, the *Bankers Trust* court described the prior case as one in which the Second Circuit had held "that the shareholder of an injured corporation did not have individual standing to bring a claim under civil RICO" and that this result followed from "a standing requirement applicable throughout corporate law: An action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation through a derivative action." *Id.* at 1101 (internal quotation marks omitted). Here, the NGP Ohio RICO Claims that Fulson attempted to assert were entirely derivative of NGP's claims. Given that Ransier has not abandoned NGP's claims against the Columbia Gas Entities but instead is settling them, Fulson never had a right to assert the claims and never would have had such a right. *Bankers Trust*, therefore, is wholly inapposite.

So too is *First Nationwide Bank*. There, the plaintiff bank alleged that the defendants had misrepresented the value of properties they pledged as collateral to secure nonrecourse loans, fraudulently inducing the bank to make the loans and in the process violating RICO. The Second Circuit noted the "general rule [that] a cause of action does not accrue under RICO until the amount of damages becomes clear and definite" and held that the bank's damages with respect to any particular loan would become clear and definite only after the bank was successful in a foreclosure action as to that loan. *First Nationwide Bank*, 27 F.3d at 768–69. But unlike Fulson's claims against the Columbia Gas Entities, the bank's claims against the defendants were not derivative claims.

Likewise, in *Goldin* the bankruptcy court noted that a "shareholder may ... have to await the bankruptcy court's disposition of the common claim since the shareholder cannot measure its injury until then[,]" but it did so only in the context of its discussion of a claim by a "shareholder who suffers an injury particular to itself." *Granite Partners*, 194 B.R. at 325. And another case on which Sanders alone relies, *Sec. Investor Prot. Corp. v. Madoff*, 490 B.R. 59, 73 (S.D.N.Y.2013), Sanders Br. at 1, also fails to support his position for the reason that the claims in those cases were not derivative claims. *See Sec. Investor Prot. Corp.*, 490 B.R. at 73 ("[T]he Anwar Plaintiffs ... [are] bringing direct federal and state causes of action against a non-debtor third party alleging claims that the Trustee cannot bring.").[27] In short, the argument made by Sanders and Lowe—that Fulson's damages will become clear and definite only after Ransier settles NGP's claims against the Columbia Gas Entities for less than Fulson believed the claims were worth—ignores the derivative nature of Fulson's claims.

Even if the Court could ignore long-standing corporate and bankruptcy law and the rationale on which the law is based to reach the result the Fulson Parties seek—which the Court cannot do—there would be no basis for doing so here. The owner of the equity of NGP was not Fulson, but instead was either NGM or NEM, both also Chapter 7 debtors. As the trustee of the estates of NGM and NEM, Ransier entered into agreements to settle any and all claims—including derivative claims—that they had against the Columbia Gas Entities, and the Court approved those settlements by orders that became final and nonappealable before

---

**27.** Sanders and Lowe also rely on *City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 768 N.E.2d 1136 (2002), suggest-

ing that it was decided under the OCPA. *See* Sanders Br. at 7; Lowe Br. at 7. *Beretta*, however, did not even mention the OCPA.

Fulson commenced the 2013 State Court Case. *See* Order, Doc. 90 in Case No. 09–52884; Order, Doc. 68 in Case No. 09–52885. Accordingly, in addition to the reasons explained above, NGM and NEM are prohibited from asserting derivative claims against the Columbia Gas Entities for the further reason that they have settled those claims. Fulson owned the equity in NGM and NEM, one of which in turn owned the equity in NGP, but that provides him no cover. For the same reasons that a direct equity holder is prohibited from asserting a derivative claim for harm to a company when the trustee of the company's bankruptcy estate has settled the claim, an indirect equity holder is all the more so prohibited from doing so.

### c. The Argument Based on the NGP Agreement

As already noted, NGP and TCO were parties to the NGP Agreement, which permitted NGP to use the gas transportation capabilities of TCO. In their post-hearing briefs, Sanders and Lowe contend that, because NGP had a contract with TCO, it is limited to contractual claims against TCO, "cannot bring fraud claims against TCO[,]" Sanders Br. at 2, Lowe Br. at 1, and cannot assert its own claims under the OCPA. *See* Sanders Br. at 2, 16 ("The Debtor, being in contractual privity with TCO, is limited to contract remedies."); Lowe Br. at 14 (same). They make this argument despite the fact that, as a limited liability company, NGP is a person within the meaning of the OCPA with standing to bring claims under the statute. They also make the argument despite the fact that, during the testimony he provided in connection with the Motion, Sanders suggested that NGP had its own claims under the

OCPA. Tr. at 79:6–7. It seems likely that Sanders changed course after realizing the import of the statement in *Van Dresser* that "if the debtor could have raised a state claim at the commencement of the bankruptcy case, then that claim is the exclusive property of the bankruptcy estate." *Van Dresser*, 128 F.3d at 947.

Regardless of the reason for the change, the argument that the NGP Agreement prevents NGP from bringing its own claims for fraud or other claims under the OCPA is flatly wrong. Sanders and Lowe cite no authority for the proposition that a party to a contract cannot assert a claim for fraud against the counterparty. The cases on which Sanders and Lowe rely in support of the argument stand only for the principle that a breach of contract in and of itself does not give rise to a tort claim.[28] But as one of the very cases cited by Sanders and Lowe recognizes, this principle has no applicability where "the acts constituting the breach of contract also constitute a cause of action in tort[,]" such as fraud. *Canderm Pharmacal, Ltd.*, 862 F.2d at 602 (internal quotation marks omitted). The NGP Ohio RICO Claims assert claims extending beyond a breach of contract by TCO; the claims also allege fraud and an illegal scheme to eliminate NGP as a competitor.

Nor do Sanders and Lowe cite any authority for the proposition that an act that both breaches a contract and violates a statute cannot, because of the existence of the contract, give rise to a statutory claim. And a moment's thought should have revealed the absurdity of this argument. For example, under the logic employed by Sanders and Lowe, an employee who is a party to an employment agreement and

---

28. *See Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597 (6th Cir.1988); *Wolfe v. Continental Cas. Co.*, 647 F.2d 705 (6th Cir.1981); *Battista v. Lebanon Trotting* *Ass'n*, 538 F.2d 111 (6th Cir.1976); *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 (1922).

who is terminated by her employer for a discriminatory reason would be prohibited from bringing a claim under an anti-discrimination statute merely because the termination also violated the agreement. The NGP Agreement provides the Fulson Parties no shield against liability for violating the automatic stay any more than an employment contract provides an employer a shield against liability for discrimination.

### 2. The Fulson Parties' Excuses Do Not Absolve Them of Liability for Contempt.

It is true, as Sanders and Lowe point out, that the Court previously noted that "[i]t is not entirely clear what the term 'indirectly' means in the context of the OCPA[.]" Sanders Br. at 2; Lowe Br. at 2 (quoting *Nicole Gas,* 502 B.R. at 514). But so what? The Court did not find the term so unclear as to permit Fulson to bring the NGP Ohio RICO Claims. And as the Court also pointed out, "at least one Ohio court has held that a derivative interest is insufficient to support a claim under the [OCPA]." *Nicole Gas,* 502 B.R. at 514 (citing *JP Morgan Chase Bank, N.A.,* 2013 WL 1183332, at *9). Furthermore, the conclusion that the Fulson Parties exercised control over property of NGP's estate when they filed the NGP Ohio RICO Claims finds support in logic, common sense and other case law that long predated the filing of the Complaint. Therefore, Sanders's and Lowe's reliance on cases such as *Waldschmidt v. Columbia Gulf Transmission (In re Fulghum Construction Co.),* 1984 U.S.App. LEXIS 14159, at * 12 (6th Cir. July 2, 1984)—in which the "application of the state provisions" to the matter at issue "was of relatively recent origin" and unclear—is misplaced. Here, the law is neither novel nor in flux, and there is nothing ambiguous about the applicable provisions of the Bankruptcy Code or the language of the OCPA as applied to the NGP Ohio RICO Claims. The Fulson Parties offer absolutely no case law or other authority that supports their position that they did not violate the automatic stay.

Finally, Sanders and Lowe argue that their actions were unintentional, harmless and promptly corrected. Sanders Br. at 2; Lowe Br. at 2. If by unintentional they mean that, as they previously said, they "carefully considered whether the filing of the [Complaint] would violate the automatic stay in this case and concluded, in good faith, that it would not[,]" Resp. to Mot. (Doc. 122) at 1, the excuse is unavailing. For reasons explained above, the Court has serious questions as to Sanders's good faith. And even if he, as well as the other Fulson Parties, acted in good faith, a "[g]ood faith [belief] is not a defense in civil contempt proceedings." *Gnesys, Inc. v. Greene,* 437 F.3d 482, 493 (6th Cir.2005); *see also TWM Mfg. Co. v. Dura Corp.,* 722 F.2d 1261, 1273 (6th Cir.1983).

The Fulson Parties' actions were not harmless. To the contrary, they have caused Ransier to incur expenses that, if not reimbursed, will reduce the distributions to other creditors. Nor was the Fulson Parties' stay violation promptly corrected. According to the Fulson Parties, "Fulson and his counsel immediately cured any stay violation in the original OCPA complaint[,]" and "[t]hey would have done this had [Ransier] simply alerted them to his concerns by telephone." Sanders Br. at 19; Lowe Br. at 17. While it is true that parties seeking to redress violations of the automatic stay should do so without incurring any more expense than is necessary, *see Gunter v. Kevin O'Brien & Assocs. Co. (In re Gunter),* 389 B.R. 67, 76 (Bankr.S.D.Ohio 2008), the telephone calls suggested by Sanders and Lowe clearly would have been ineffectual here. In fact, even after Ransier filed the Stay Notice,

and after the State Court entered the Stay Order and this Court entered the Show Cause Order, the Fulson Parties remained obstinate, going so far as to oppose the injunction that is a prerequisite to TCO's willingness to consummate the settlement with Ransier and then, just recently, substituting Fulson's probate · estate as the plaintiff in the 2013 State Court Case.

Each of the arguments propounded by the Fulson Parties is meritless. Having disposed of those arguments, the Court, based on its analysis of the Bankruptcy Code and Ohio law, concludes that the commencement and continuation of the 2013 State Court Case constituted an attempt to exercise control over property of NGP's estate.

 Finally, Sanders contends that any contempt order that is entered should be issued only against him because Fulson and Lowe trusted and relied on his explanation for why they could pursue the 2013 State Court Case despite the pendency of the automatic stay. Sanders Br. at 19–20. Sanders has no right to insulate Fulson and Lowe from liability. Trust and reliance on another does not shield a person who knowingly violates the automatic stay from liability for contempt. This is true whether one is an attorney or not. As to Fulson, who was the client, "advice of counsel and good faith conduct do not relieve from liability for a civil contempt, although they may affect the extent of the penalty." *TWM Mfg. Co.*, 722 F.2d at 1273 (internal quotation marks omitted). As to Lowe, he was Fulson's counsel, and he reviewed, signed and filed the Complaint and the Amended Complaint. Furthermore, like Sanders, Lowe continues to oppose an injunction against pursuing the NGP Ohio RICO Claims even though there is no reason to do so except to preserve the ability to amend the Amended Complaint to reassert those claims once the NGP case closes. In determining that the pursuit of the NGP Ohio RICO Claims violates the automatic stay, the Court has carefully analyzed and applied the applicable bankruptcy and state-law authorities. Sanders and Lowe would have been well advised to have done likewise.

## VI. Conclusion

In light of the foregoing, the Court holds that the Fulson Parties violated the automatic stay and were in contempt of Court when they commenced and continued the 2013 State Court Case. Ransier requests that the Court award him reasonable attorneys' fees and costs. Ransier shall file a statement of fees and expenses, together with an explanation of why those fees and expenses are reasonable under the circumstances ("Fee Statement"), no later than **October 10, 2014.** Sanders, Lowe and Fulson's estate shall have until **October 24, 2014** to file any objections to the Fee Statement. Any objection must state with particularity why any fees charged or expenses set forth in the Fee Statement are unreasonable or otherwise are not properly recoverable by Ransier as damages caused by the Fulson Parties' contemptuous conduct. If an objection is filed, a hearing on damages will be scheduled by separate order.

**IT IS SO ORDERED.**