RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0026p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――

NICOLE GAS PRODUCTION, LTD.,

*Debtor.*

―――――――――――――――――――――――――――

JAMES A. LOWE; CURTLAND H. CAFFEY; S. BREWSTER RANDALL, II; ROBERT C. SANDERS,

*Appellants,*

*v.*

BRENDA K. BOWERS, Chapter 7 Trustee of the Bankruptcy Estate of Nicole Gas Production, Ltd.,

*Appellee.*

No. 18-3301

―――――――――

On Appeal from the Bankruptcy Appellate Panel of the Sixth Circuit.
Nos. 15-8053/8055—Paulette J. Delk, Marian F. Harrison, and Daniel S. Opperman, Bankruptcy Appellate Panel Judges.

United States Bankruptcy Court for the Southern District of Ohio at Columbus.
No. 2:09-bk-52887—John E. Hoffman, Judge.

Argued:  October 18, 2018

Decided and Filed:  February 22, 2019

Before:  MERRITT, COOK, and LARSEN, Circuit Judges.

―――――――――

## COUNSEL

**ARGUED:**  Rick L. Ashton, ALLEN, KUEHNLE, STOVALL & NEUMAN, LLP, Columbus, Ohio, for Appellant Lowe.  Robert C. Sanders, Upper Marlboro, Maryland, pro se.  Daniel E. Shuey, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Rick L. Ashton, James A. Coutinho, ALLEN, KUEHNLE, STOVALL

& NEUMAN, LLP, Columbus, Ohio, for Appellant Lowe.  Daniel E. Shuey, Brenda K. Bowers, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellee.  Robert C. Sanders, Upper Marlboro, Maryland, S. Brewster Randall, II, Curtland H. Caffey, Columbus, Ohio, pro se.

---

**OPINION**

---

MERRITT, Circuit Judge.  This is a bankruptcy contempt dispute.  Normally a party's conduct is contemptuous or it is not.  But in this unusual case, whether the defendants are in contempt depends on statutory construction.  The question presented is whether the Ohio RICO statute gives the sole shareholder of a bankrupt corporation standing to circumvent the automatic stay and individually sue a competitor.  The issue is a complex intersection of three areas of law: the principle of the derivative suit in corporate law, the function of the automatic stay in bankruptcy, and the extent and construction of a specific state's RICO laws.  In this appeal, we must consider how these precepts work together where the RICO statute offers no explicit guidance on how the claim should operate in the corporate and bankruptcy contexts.  But for all the legal overlays here, ultimately the Appellants are in contempt or they are not.

The basic facts.  Appellant Freddie Fulson[1] owned a company called Nicole Gas that entered bankruptcy proceedings.  During the bankruptcy, Fulson became dissatisfied with the Trustee's handling of claims that Nicole Gas held against its competitors.  With the help of two lawyers, Appellants Robert Sanders, Esq. and James A. Lowe, Esq., Fulson sought relief in state court under the Ohio Corrupt Practices Act (Ohio civil RICO) against the competitors that allegedly put his business into bankruptcy.  Because Fulson alleged damages incurred only by the debtor-business, the Trustee alleged that he had appropriated claims that the Trustee owned.  By filing this action during the bankruptcy, the Trustee alleged that Fulson, Sanders, and Lowe violated the automatic stay.  The Bankruptcy Court agreed and held the three in contempt and entered a judgment for roughly $91,000.  The contempt finding and fee order are the subjects of the instant appeal.

---

[1]Fulson died during the pendency of the bankruptcy, and his estate was substituted in the proceedings below and here.

Back to legal principles. Derivative liability is a cardinal tenet of corporate common law. When an artificial entity (a corporation) is injured, shareholders cannot necessarily redress that injury themselves. *See* 19 Am. Jur. 2d *Corporations* § 1935 (1998) ("[W]here the injury is to the corporation, and only indirectly harms the shareholder, the claim must be pursued as a derivative claim."); *see also* James D. Cox & Thomas Lee Hazen, 3 Treatise on the Law of Corporations § 15:2 (3d ed. 2010) ("An almost necessary consequence of a wrong to a corporation is some impairment of the value of each shareholder's stock interest. As a general rule, however, shareholders are considered to have no direct individual right of action for corporation wrongs that impair the value of their investment.").

As to the bankruptcy gloss on this dispute, the Bankruptcy Code imposes a powerful stay on parties attempting to gain control over the property of the debtor's estate. *See* 11 U.S.C. § 362(a)(3) ("[A] petition . . . operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate"). The policy imperative behind the automatic stay is to "give[] the debtor a breathing spell from creditors and stop[] foreclosure actions, collection efforts, and creditor harassment." 2 Norton Bankr. L. & Prac. 3d § 43:4 (2019).

The precise language of the Ohio Corrupt Practices Act is the complicating factor here. The Appellants claim that the wording of the statute converts a derivative shareholder action to an individual claim because it provides a private right of action for "any person directly or indirectly injured by conduct" violating the Act. Ohio Rev. Code § 2923.34. As the sole shareholder of Nicole Gas, normally Fulson would have to seek relief from Nicole Gas's competitors via the traditional route of derivative liability. But, his successors argue, the Corrupt Practices Act means both (a) that he did not have to pursue a derivative claim at all, and (b) that thus, the bankruptcy Trustee did not have the right to exercise control over the claim. If Fulson's successors are right, and the claim against Nicole Gas's competitors can be alleged outside of corporate law and via the Corrupt Practices Act, then they did not violate the automatic stay. Thus, the basis for the Contempt and Fee Orders would disappear. We shall see in due course that they are wrong. In agreement with the persuasively reasoned decisions below, both in the Bankruptcy Court and the Bankruptcy Appellate Panel, we **AFFIRM**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In the late 1990s, Freddie Fulson formed several corporate entities to produce and market natural gas in the Midwest.  One of these entities is the debtor in the bankruptcy case, Nicole Gas Production, Ltd.  The bottom line is that Fulson was the indirect equity owner of Nicole Gas and was calling the shots.  To market and move the gas, Fulson's entities contracted with a larger company, Columbia Gas Transmission, and its affiliates.  Eventually, relations between Columbia Gas and Fulson's entities soured and in the early 2000s a decade of litigation in state and federal court began.  For his part, Fulson believed that Columbia Gas had conspired with other entities, including Nicole Gas's creditors, to put him out of business.  Columbia Gas did this, he alleged, by mismeasuring the amount of natural gas produced by Fulson's wells, misappropriating gas that the entities delivered into Columbia Gas's transmission system, and improperly soliciting his creditors to force Nicole Gas into bankruptcy proceedings.  This bankruptcy proceeding began in 2009 and has continued since then, but it is only the tip of the iceberg of the disputes between these entities.

In 2013, while Nicole Gas was in bankruptcy proceedings, the corporation's bankruptcy Trustee, Frederick Ransier, proposed settling all of Nicole Gas's claims against Columbia Gas for $250,000.  Back in 2001, one of Nicole Gas's affiliates, Nicole Energy Services, Inc., had asserted claims against Columbia Gas for $36 million.  Likely miffed that the Trustee was trying to settle similar claims for less than a million dollars, Fulson objected to that settlement in October of 2012.  But objecting in the proper and usual course was not enough for him.  Sometime after objecting to the settlement, Fulson began working with Robert C. Sanders, Esq., a Maryland attorney who had represented one of Fulson's other gas companies in state court.  Fulson filed a new complaint in Ohio state court against Columbia Gas seeking roughly $34 million in damages.  Fulson, Sanders, and Lowe wanted to try the claims to a jury in state court because, according to Sanders, jurors "don't like utility companies."  519 B.R. at 740 n.18.

The state court complaint recited the history between the companies and alleged that Columbia Gas had violated the Ohio Corrupt Practices Act, Ohio Rev. Code § 2923.31 *et seq*., which provides that no person shall engage in a pattern of corrupt activity, defined as engaging in racketeering, theft, telecommunications fraud, and the like.  *Id.* § 2923.32.  This is Ohio's

Racketeer Influenced and Corrupt Organizations ("RICO") statute.  The Act includes a private right of action in § 2923.34 which allows for treble damages for "*any* person directly or *indirectly* injured by conduct" violating the Act (emphasis added).  The Act presented an attractive avenue for relief because it carries treble damages and confers broad standing on litigants.  Fulson and Sanders then hired James A. Lowe, Esq., of Cleveland as local counsel, and the three of them together filed the complaint (with Fulson as the sole plaintiff) in the Court of Common Pleas for Franklin County, Ohio, in January 2013.  Because Nicole Gas was a domestic limited liability company, it counted as a "person" in Ohio and could have asserted these claims against Columbia Gas.

There was one big problem with the complaint:  Fulson couched his damages as directly resulting from his status as the sole shareholder of Nicole Gas' parent corporation.  He alleged no damages that related to him personally; he only pled that he had been harmed *because of* his indirect ownership of Nicole Gas.  In multiple paragraphs of the complaint, Fulson's attorneys recited the damages to Fulson *as sustained by* the corporation he owned.[2]  Usually, when a corporation is damaged, shareholders seek relief through a derivative suit.  Fulson, Sanders, and Lowe, however, believed that the language of the Corrupt Practices Act would allow them to circumvent both the automatic stay and the principle that the bankruptcy trustee has the sole right to assert a debtor's causes of actions.  *See Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 853 (6th Cir. 2002); *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir. 1988).

Because Nicole Gas was in bankruptcy proceedings, filing a derivative suit (based on the Corrupt Practices Act or some other statute) would have meant seeking relief from the automatic stay, *see* 11 U.S.C. § 362(d); Fed. R. Bankr. P. 4001(a), or convincing the bankruptcy trustee to either bring the claims himself or abandon them, *see Maloof v. Level Propane, Inc.*, 429 F.

---

[2]For instance, Paragraph 120 of the state court complaint reads, "The Plaintiff has standing to bring a civil action against the Defendants under Section 2923.34(E) of the Act because, as the owner of NES, he is a person who was 'directly or indirectly injured' by the Defendants' violations…" (emphasis added).  Paragraph 126 continues this grammatical pattern: "The amount of the damages caused to the Plaintiff by the Defendant's violations of the Act are (1) the net damages of $36,654,305.94 sustained by NES…and (2) the damages sustained by NGP…" (emphasis added).  By its very terms, then, the state court complaint pled damages that were incurred by the corporation.

App'x 462, 468 (6th Cir. 2011).  Keep in mind that in a Chapter 7 bankruptcy, the role of the Trustee is to close the estate as expeditiously as possible.  *See* 11 U.S.C. § 704(a); *see also In re Modern Plastics Corp.*, 732 F. App'x. 379, 384 (6th Cir. 2018) (discussing trustee duties).  Fulson and his lawyers did not consult Ransier, who discovered the complaint when an employee conducted a routine state court docket check.  At that time, Ransier was in the process of negotiating and finalizing a settlement agreement with Columbia Gas that would take care of "any and all" claims Nicole Gas might hold against Columbia.  Ransier believed that the Corrupt Practices Act claim fell under this settlement umbrella, and he filed a Motion for Contempt before the Bankruptcy Court.  The Corrupt Practices action in state court was stayed.

The Bankruptcy Court held a hearing and heard testimony from Fulson's two attorneys and Ransier.  In a 56-page order (the "Contempt Order"), reported as *In re Nicole Gas Prod., Ltd.*, 519 B.R. 723 (Bankr. S.D. Ohio 2014), the Court found that Fulson, Lowe, and Sanders (collectively, "the Fulson Parties") had willfully violated the automatic stay, 11 U.S.C. § 362(a)(3), by filing the Corrupt Practices Act complaint.  In this order, the Bankruptcy Court analyzed the Ohio Corrupt Practices Act in detail and concluded that Fulson had no independent standing to raise claims that belonged to Nicole Gas.  After soliciting additional briefing and holding a separate hearing, the Court issued a second 51-page order (the "Fee Order"), reported as *In re Nicole Gas Prod., Ltd.*, 542 B.R. 204 (Bankr. S.D. Ohio 2015), detailing the amount of damage that the Fulson Parties had done to Nicole Gas's estate and directing them to pay $91,068.00 to Ransier.  The Fulson Parties – Fulson's attorneys in the Corrupt Practices Act case (James A. Lowe, Esq. and Robert C. Sanders, Esq.), and the administrators of Fulson's estate – appealed the Contempt and Fee Orders to the Bankruptcy Appellate Panel for the Sixth Circuit.

The Bankruptcy Appellate Panel proceeded in two stages.  In August 2016, the Panel certified a question of law to the Ohio Supreme Court.  The Panel asked the Ohio Supreme Court whether an injured shareholder was entitled to individual standing under the Ohio Corrupt Practices Act.  In October 2016, the Ohio Supreme Court declined to answer the certified question and dismissed the cause.  In March of 2018, the Bankruptcy Appellate Panel issued a decision addressing the merits of the Fulson Parties' claims.  The Panel affirmed the Bankruptcy Court in all respects (the "Bankruptcy Appellate Panel Opinion"), reported as *In re Nicole Gas*

*Prod., Ltd.*, 581 B.R. 843 (B.A.P. 6th Cir. 2018), and concluded that an individual shareholder could not use the Ohio Corrupt Practices Act to convert a corporate law claim into an individual one. Thus, the claim was the property of the bankruptcy estate, and the Fulson Parties had violated the automatic stay by misappropriating that claim. The Fulson Parties appealed again to the Sixth Circuit. Ransier was eventually replaced by Brenda K. Bowers, the Successor Trustee of the bankruptcy estate of Nicole Gas Production, Ltd.

## II. ANALYSIS

We have jurisdiction to review orders of the Bankruptcy Appellate Panel under 28 U.S.C. § 158(d)(1). Review of the Bankruptcy Court's decision is independent of the Bankruptcy Appellate Panel's review. *In re Curry*, 509 F.3d 735 (6th Cir. 2007). The Sixth Circuit uses the "clear error" standard for factual findings and reviews conclusions of law de novo. *In re Century Boat Co.*, 986 F.2d 154, 156 (6th Cir. 1993). Generally, bankruptcy court determinations of contempt are examined under an abuse of discretion standard. *In re Wingerter*, 594 F.3d 931, 936 (6th Cir. 2010).

Filing a bankruptcy petition creates a bankruptcy estate, which includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), including causes of action, *In re Parker*, 499 F.3d 616, 624 (6th Cir. 2007). "The nature and extent of property rights in bankruptcy are determined by the 'underlying substantive law'"—Ohio law, in this case. *Tyler v. DH Capital Mgmt., Inc.*, 736 F.3d 455, 461 (6th Cir. 2013); *In re Underhill*, 579 F. App'x 480. 482 (6th Cir. 2014) ("State substantive law determines the 'nature and extent' of causes of action . . ."). "[O]nce that determination is made, federal bankruptcy law dictates to what extent that interest is property of the estate for the purposes of § 541." *DH Capital Mgmt.*, 736 F.3d at 461 (quoting *Bavely v. United States (In re Terwilliger's Catering Plus, Inc.)*, 911 F.2d 1168, 1172 (6th Cir. 1990)).

If a shareholder has sole right to assert a cause of action, the cause of action is not part of the bankruptcy estate. Whether a shareholder "has sole right to a cause of action is determined in accordance with state law." *Honigman v. Comerica Bank (In re Van Dresser Corp.)*, 128 F.3d 945, 947 (6th Cir. 1997) (citing *Oakland Gin Co. v. Marlow (In re The Julien Co.)*, 44 F.3d 426,

429 (6th Cir. 1995). Under *Van Dresser*, whether "shared" causes of action belong to the bankruptcy estate comes down to two questions: (1) whether both the shareholder and the corporation-debtor could *state* claims for the damages; and, if so, (2) whether the shareholder and corporation-debtor could both *recover* full damages. *Van Dresser*, 128 F.3d at 947–48. If either's recovery can "preclude[] the other from a subsequent recovery, then the claims are not truly independent." *Id.* Absent being "truly independent," the claims belong to the bankruptcy estate in toto.

### A. The Ohio Corrupt Practices Act

The most important question raised by the Fulson Parties is substantively a question of Ohio state law. There is no case or statute explicitly suggesting that the Ohio Corrupt Practices Act does or does not confer standing upon an individual shareholder to seek redress for damages visited upon a corporation. But applying principles of construction announced by the Ohio Supreme Court, we can triangulate a clear answer. The relevant section of the Corrupt Practices Act reads:

> (E) In a civil proceeding under division (A) of this section, *any person* directly *or indirectly* injured by conduct in violation of section 2923.32 of the Revised Code or a conspiracy to violate that section, other than a violator of that section or a conspirator to violate that section, in addition to relief under division (B) of this section, shall have a cause of action for triple the actual damages the person sustained. To recover triple damages, the plaintiff shall prove the violation or conspiracy to violate that section and actual damages by clear and convincing evidence. Damages under this division may include, but are not limited to, competitive injury and injury distinct from the injury inflicted by corrupt activity.

Ohio Rev. Code § 2923.34(E) (emphasis added).[3] On its face, this is a broadly written statute allowing for a wide set of claims. It employs the words "any" and "indirectly" to expand the scope of civil RICO claims contemplated in the federal case law. *See Iron Workers Local Union*

---

[3]The rest of the Ohio Corrupt Practices Act contains few explicit references to corporate law. First, Ohio Rev. Code § 2923.34(B)(5) allows a court to dissolve a corporation on a finding that the corporation violated the Act. Second, the Act's Definitions section, § 2923.31(A)(3), excludes stockholders from the definition of "beneficial interest." But as the Act currently stands, "beneficial interests" are only referenced in § 2923.36, which discusses the filing of corrupt activity liens. In other words, one may not file a corrupt activity lien against the interest of a stockholder. Aside from these passing references, corporate law and rights thereunder go unmentioned in the Act. The statute is simply not written as specifically addressing claims relating to the corporate form.

*No. 17 Ins. Fund v. Philip Morris Inc.*, 23 F. Supp. 2d 771, 788 (N.D. Ohio 1998) (hereinafter *Iron Workers I*) ("In choosing to broaden standing to bring RICO actions under state law, the Ohio General Assembly decided to widen the right to bring an action."). But it is not clear in this context that by using "indirectly injured" the statute allows shareholders to seek recovery under the Corrupt Practice Act for an entity's injury. Indeed, the conclusion that "indirect" injuries under the Corrupt Practices Act *do* include a shareholder's derivative injuries is as plausible as the conclusion that they *do not*. The statutory language is thus ambiguous. *See Jacobson v. Kaforey*, 75 N.E.3d 203 (Ohio 2016) ("Ambiguity, in the sense used in our opinions on statutory interpretation, means that a statutory opinion is capable of bearing more than one meaning." (quotation marks omitted)); *Hughes v. White*, 388 F.Supp.2d 805, 818 (S.D. Ohio 2005) ("A statute is ambiguous 'if the language is susceptible [to] more than one reasonable interpretation." (quoting *State v. Jordan*, 733 N.E.2d 601, 605 (Ohio 2000))).

Because the language is ambiguous, we therefore look to additional principles of statutory interpretation. *State v. Thomas*, 70 N.E.3d 496, 498 (Ohio 2016). We must, for example, presume that the Ohio General Assembly passed the Corrupt Practices Act with knowledge of the existing common law of derivative suits. In Ohio, shareholders may not pursue claims based on injuries to a corporation in which the shareholder holds an interest; the proper path for remedy is the derivative suit. *See generally* 12 Ohio Jur. 3d *Business Relationships* § 899 (2018) ("A plaintiff-shareholder does not have an independent cause of action where there is no showing of individual injury in any capacity other than in common with all other shareholders as a consequence of the wrongful actions of a third party directed toward the corporation."). The seminal Ohio case is *Adair v. Wozniak*, 492 N.E.2d 426 (Ohio 1986). In *Adair*, the Ohio Supreme Court wrote:

> Where the defendant's wrongdoing has caused direct damage to corporate worth, the cause of action accrues to the corporation, not to the shareholders, even though in an economic sense real harm may well be sustained by the shareholders as a result of reduced earnings, diminution in the value of ownership, or accumulation of personal debt and liabilities from the company's financial decline. *The personal loss and liability sustained by the shareholder is both duplicative and <u>indirect</u> to the corporation's right of action….* Although this is a case of first impression, we accept and follow the widely recognized rule that a plaintiff-shareholder does not have an independent cause of action where there is

no showing that he has been injured in any capacity other than in common with all other shareholders as a consequence of the wrongful actions of a third party directed towards the corporation.

*Id.* at 429 (internal citations omitted) (emphasis added).  In short: a shareholder cannot "enter the fray" for injuries sustained by a corporation that have lowered the value of his or her interest in that corporation.   Interpreting *Adair*, the Bankruptcy Court below wrote that the Corrupt Practices Act may have removed "indirectness" as a bar to recovery but could not remove the bar erected by corporate law.  519 B.R. at 746.  We agree.

The Fulson Parties, however, seize upon the language in *Adair*, and argue that the Ohio Supreme Court's use of the word "indirect" in the above-quoted passage means that the claim for indirect damages under the Act is viable.  Because *Adair* says that a shareholder is "indirectly" injured when the corporation is injured, they contend, the Corrupt Practices Act's use of the word "indirect" affords an injured shareholder standing for civil RICO.  The argument is that the Corrupt Practices Act gives the Fulson Parties an "out" with regard to complying with the rules of derivative shareholder suits.

This reading is strained to say the least.  Why?  Because the two documents are not talking about the same thing.  *Adair* employed the word "indirect" to characterize shareholder claims against a corporate antagonist as secondary and duplicative in a pejorative sense.  If shareholders of Apple could pursue claims against Samsung and bypass the derivative suit, it would render the corporate form superfluous.  The very holding of *Adair* is that shareholders cannot strike out on their own to right wrongs visited on the corporation.  Allowing indirectly injured parties to sue does not mean that the Act allows *anyone* to sue in all situations.  The use of the word "indirect" in both *Adair* and the Act is a coincidence, not a confluence.  The Fulson Parties' attempts to cast the occurrence of the word "indirect" in two places as somehow deliberate or instructive cannot overcome the presumption that the Act did not intend to restructure corporate law absent a clear statement of the intent to do so.  *See, e.g.*, *Mann v. Northgate Invs., L.L.C.*, 5 N.E.3d 594, 598–99 (Ohio 2014).  The Bankruptcy Court correctly deemed the Fulson Parties' argument "the sophist's game."  519 B.R. at 746.

Ohio corporate law supplies further support for our conclusion. The analogous right to sue for injuries to Nicole Gas never belonged to Fulson in the first place. *See Boedeker v. Rogers*, 746 N.E.2d 625, 632–33 (Ohio Ct. App. 2000) (citing *Adair* for the proposition that "[w]here the basis of the action is a wrong to the corporation, redress must be sought in a derivative action"). As the Bankruptcy Appellate Panel noted, the state court complaint did not allege any injuries *specific to* Fulson outside of his role as owner. 581 B.R. at 851 ("Appellants have conceded at least three times – in the state court complaint, before the Bankruptcy Court, and in their initial appellate brief – that Fulson sought recovery which would make the *Debtor* whole.") (emphasis in original). If, for instance, a shareholder of Corporation A slipped and fell on the floor of the premises of Corporation B (Corporation A's rival), then that shareholder would have an independent basis to pursue a claim against Corporation B. 519 B.R. at 739 (citing *Honigman v. Comerica Bank (In re Van Dresser Corp.)*, 128 F.3d 945, 947 (6th Cir. 1997)). That is not the case here; there is no independent basis for liability.

Corporate law cabins the claims that a shareholder may raise *when the entity in which she owns stock is injured*, and the value of her shares had decreased accordingly. "Stated another way, a shareholder brings a derivative action on behalf of the corporation for injuries sustained by or wrongs done to the corporation, and a shareholder brings a direct action where the shareholder is injured in a way that is separate and distinct from the injury to the corporation." *HER, Inc. v. Parenteau*, 770 N.E.2d 105, 109 (Ohio Ct. App. 2002); *see also Crosby v. Beam*, 548 N.E.2d 217, 219 (Ohio 1989) ("[I]f the complaining shareholder is injured in a way that is separate and distinct from an injury to the corporation, then the complaining shareholder has a direct action."). A derivative suit is a shareholder's single path through which she may recover losses the corporation sustained in the rough and tumble of the marketplace.

The Corrupt Practices Act says nothing about this process; allowing indirectly injured plaintiffs to sue is not the same as constructing an explicit statutory mechanism to bypass corporate law. Although the text of the Ohio RICO statute indicates that it grants broader standing than federal RICO, we see no clear indication that, by using the term "indirect," the Ohio General Assembly supplanted an entire area of the common law. Instructively, shareholders cannot pursue claims individually against competitors under the federal RICO

statutes. *See Warren v. Mfrs. Nat'l Bank of Detroit*, 759 F.2d 542 (6th Cir. 1985) (holding that a sole shareholder could not individually allege federal RICO claims that a bank put his steel company out of business); *State v. Franklin*, Nos. 24011 & 24012, 2011 WL 6920727, at *16 (Ohio Ct. App. Dec. 30, 2011) (noting that Ohio courts still look to federal RICO case law for guidance in applying Ohio RICO).  There is no basis for expanding Ohio RICO to the extent the Fulson Parties assert.

The legislature is perfectly capable of adding a *tool* (broad civil RICO) to potential plaintiffs' toolboxes without simultaneously throwing a different tool*box* (corporate derivative suits) out the window.  The Fulson Parties argue otherwise, and point to *Clark v. Scarpelli*, 744 N.E.2d 719, 726 (Ohio 2001), which held that "[i]t is presumed that the General Assembly is fully aware of any prior judicial interpretation of an existing statute when enacting an amendment."  In other words, the Fulson Parties say, the Ohio legislature is presumed to have known about derivative liability and the key words of that corpus; so its choice of words in expanding civil RICO is the final say.  But the legislature's presumed omniscience does not mean that the enactors of the Corrupt Practices Act intended to destroy a whole area of corporate law without so much as mentioning it.  As the Bankruptcy Appellate Panel correctly noted, "the Legislature can 'mean what it said' when it granted standing to those who suffer indirect injury without intending to turn on its head a century of law governing shareholder litigation.  Shareholder derivative suits involve one discreet corner of corporate jurisprudence."  581 B.R. at 850.

What little Ohio case law addresses these issues supports our conclusions.[4]  And although Ohio has not seen a case directly considering derivative civil RICO in the bankruptcy context, another state in our Circuit, Michigan, has.  *See Kelley v. Thompson-McCully Co., LLC*, No. 236229, 2004 WL 1676760 (Mich. Ct. App. July 27, 2004).  And – no surprises – the Michigan Court of Appeals concluded that a shareholder's derivative claim belonged to the bankruptcy

---

[4]Ohio's civil RICO jurisprudence contains several examples of "derivative" or "indirect" claims, although none in the corporate context.  *See Iron Workers I*, 23 F. Supp. 2d at 791; *Cleveland v. JP Morgan Chase Bank, N.A.*, No. 98656, 2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013). These cases are not wholly dispositive, but we may simply look to them for the proposition that the Corrupt Practices Act does not allow plaintiffs to merge distinct claims belonging to different parties.

trustee.[5]   The Michigan case also teaches that the Fulson Parties should have petitioned the Bankruptcy Court for guidance about their planned suit.  *Id.* at *3 ("[T]he shareholder must make a demand on the trustee.").   Courts outside of our Circuit have held similarly when these problems have arisen.[6]

In sum:  Fulson and his lawyers may have believed that the claims against Columbia Gas were worth more than the Trustee was settling them for.  If they thought that Fulson had a shot at suing Columbia Gas via the Corrupt Practices Act, the proper course would have been to seek the Trustee's cooperation or abandonment, or to seek relief from the automatic stay.  But, as the Bankruptcy Court noted, "filing the Complaint without providing Ransier notice and without requesting the Court grant relief from the automatic stay appears to have been a calculated risk by one who believed it more expedient to ask for forgiveness rather than for permission." 519 B.R. at 736.  It is clear that the Fulson Parties, by filing and continuing the state court lawsuit, "act[ed] to obtain possession of the property of the estate . . . or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

## B. The Automatic Stay and The Fee Award

Because Nicole Gas was in bankruptcy, the Trustee was in charge of any claims the debtor-business might hold.  *Cf. Griffin v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 805 F.2d 1515 (11th Cir. 1986) (similar dispute with shareholder suit).   If Fulson was considering pursuing claims belonging to the corporation he owned, then upon the moment of the bankruptcy filing, those claims belonged to the corporation's bankruptcy estate.  *In re Van Dresser Corp.*,

---

[5]In *Kelley*, the plaintiff was a shareholder and corporate officer in a company called West Shore Construction that entered bankruptcy proceedings.  The suit concerned a failed corporate buyout, and the plaintiff alleged that the defendants had conspired to ruin West Shore.  *Kelley*, 2004 WL 1676760, at *1.  One of the claims was styled under the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.778(2), which allows "any other person…injured directly or indirectly…" to sue under the statute for antitrust claims.  The Michigan Court of Appeals held that because the injured party was the corporation, West Shore, the derivative nature of the suit meant that the claim belonged to the bankruptcy trustee.  *Kelley*, 2004 WL 1676760, at *3.

[6]The Oregon Court of Appeals has concluded that shareholders may not assert derivative claims under the Oregon RICO statutes.  *See Loewen v. Galligan*, 882 P.2d 104, 113 (Or. Ct. App. 1994) ("[T]he only injury that plaintiffs' [Oregon RICO] claims allege is a diminution in share value that affected all shareholders. Because that injury is derivative, we conclude that plaintiffs do not have standing to bring their [Oregon RICO] claims.") (internal citations omitted).  *See also Harris v. Orange S.A.*, 636 F. App'x 476, 483 (11th Cir. 2015) (analyzing Georgia RICO).

128 F.3d at 947 ("[I]f the debtor could have raised a state claim at the commencement of the bankruptcy case, then that claim is the exclusive property of the bankruptcy estate…").  The Fulson Parties argue that Fulson's individual Corrupt Practices Act claims were not the property of the bankruptcy estate because the claims had not accrued at the time of the petition.  They further assert that it was only when the claims were valued at $250,000 by the Trustee that those claims accrued.  This is nonsense.  Fulson never had any independent claims to assert.  The Bankruptcy Court fully and correctly addressed these arguments in the Contempt Order.  To this, Appellants retort, if Fulson had no standing under the Corrupt Practices Act, then he could not have violated the stay by asserting "claims that do not exist."  This is, to borrow the Bankruptcy Court's term, sophistry.  To the contrary, because the Corrupt Practices Act claims were property of the estate, filing the state court complaint was an impermissible "act to obtain possession of the property of the estate . . . or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  Here is the bottom line:  whatever corporate wrongs had been visited upon Nicole Gas, the right to *redress* those claims belonged to Nicole Gas itself.  Upon the filing of the bankruptcy petition, those claims passed into the hands of Ransier, who was trying to settle "any and all" claims with Columbia Gas.  Any Corrupt Practices Act claim that Nicole Gas could have asserted fell into that box.  Before bankruptcy and after, Fulson did not have the power to sue individually on those claims.  But he did, and thus violated the automatic stay.

The automatic stay is one of the most important and powerful features of the bankruptcy system.  *Cf. Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993) ("[A]ctions taken in violation of the stay are invalid and voidable and shall be voided absent limited equitable circumstances.").  Violating the automatic stay constitutes civil contempt.  *See In re Crabtree*, 767 F.2d 919, 1985 WL 13441 (6th Cir. 1985) (table).  The Bankruptcy Court below did not simply conclude that the Fulson Parties had fumbled their way into violating the automatic stay – it deemed their actions willful and called their credibility into question. 519 B.R. at 736.  Further, as highlighted by the Bankruptcy Appellate Panel, if Fulson had secured a judgment on his Corrupt Practices Act claims in state court, the bankruptcy estate would have been prejudiced.  581 B.R. at 853.  The Bankruptcy Court made detailed findings in this regard, and it acted diligently and thoughtfully to protect its own procedures and the Bankruptcy Code.

With regard to the Fee Order, the Fulson Parties argue that *Baker Botts, L.L.P. v. ASARCO, L.L.C.*, 135 S. Ct. 2158 (2015), precludes the Bankruptcy Court from awarding fees to the trustee. The *Baker Botts* case simply held that, "Because § 330(a)(1) does not explicitly override the American Rule with respect to fee-defense litigation, it does not permit bankruptcy courts to award compensation for such litigation." *Id.* at 2169. But, as recited by the Bankruptcy Appellate Panel, Section 330, which governs compensation for certain professionals, is irrelevant here. 581 B.R. at 854–55. The Bankruptcy Court here relied on 11 U.S.C. § 105(a) to hold Sanders, Lowe, and Fulson in contempt. 519 B.R. at 736–37. Section 105(a) states that "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The sole authority the Fulson Parties cite as to their *Baker Botts* argument, *City of Philadelphia v. Walker*, No. CV-15-01685, 2015 WL 7428501 (E.D. Pa. Nov. 23, 2015), contains no references to contempt or 11 U.S.C. § 105.

Whatever limits apply to the Bankruptcy Court's contempt powers, *see generally In re John Richards Homes Bldg. Co.*, 552 F. App'x 401, 414 (6th Cir. 2013) ("Those powers are circumscribed and have most often been limited to compensatory punitive awards of attorney's fees after findings of bad faith or contempt."), they do not apply on these facts. *See Liberis v. Craig*, 845 F.2d 326, 1988 WL 37450 at *8 (6th Cir. 1988) (table) ("In the instant case, there is no question that the bankruptcy court had the authority to award attorneys' fees against the plaintiffs to compensate the trustee for bringing plaintiffs' contempt to the court's attention."). In an opinion written with "painstaking detail," 581 B.R. at 855, the Bankruptcy Court found that Fulson, Sanders, and Lowe were aware of the automatic stay, and had intentionally taken actions that violated it, regardless of their good faith or lack thereof. 519 B.R. at 729–30, 754–55. A contempt finding and accompanying sanctions were appropriate.

### III. CONCLUSION

Assuming best intentions, Fulson may have believed he personally had a viable claim to assert against Columbia Gas. But by the time he filed the Corrupt Practices Act complaint, it was far too late to make such claims without seeking relief from the stay or the trustee's cooperation. Fulson, Sanders, and Lowe were all aware of the automatic stay, and took action that, we agree, violated it. One of the unfortunate results in this case is that it is unclear precisely

how much Fulson's claims against Columbia Gas were worth. The Trustee tried to settle them for $250,000, but Fulson obviously believed them to be worth millions more. If Fulson or his attorneys had communicated their theory to the Trustee, perhaps the Ohio courts could have confronted head-on the question of indirect pursuit of civil RICO claims under Ohio law. And as a policy matter, there may be situations in which shareholders possess viable civil RICO claims against a company that destroyed the shareholder's business. But instead, we are left to assess the question collaterally in the contempt context, with sanctions against the Fulson Parties riding on our interpretation. These legal ambiguities could have been addressed with a simple collaborative phone call. Instead, the Bankruptcy Court was forced to expend valuable judicial resources assessing whether the conduct was in fact contemptuous.

This is a case where the Bankruptcy Court did its job and did it well. These issues have been extensively briefed thrice, once at the Bankruptcy Court, once at the Bankruptcy Appellate Panel, and again here in the Circuit. The one complex issue in this case – whether the Ohio Corrupt Practices Act allows shareholders to pursue claims individually – was convincingly handled by the Bankruptcy Court; the Bankruptcy Appellate Panel agreed and so do we. We conclude that the Corrupt Practices Act did not grant Fulson any independent cause of action to pursue his derivative damages without violating the automatic stay. And *Baker Botts* does not apply to the Bankruptcy Court's fee award here, which was a contempt sanction. Fulson and his attorneys should have sought either the trustee's cooperation or relief from the automatic stay in order to file the complaint. For all of the foregoing reasons, and for the reasons articulated by the Bankruptcy Court and the Bankruptcy Appellate Panel below, we **AFFIRM**.